No. 45,185

Thomas Allen and Frances Allen, *Appellants,* v. Lucille M. Schauf, Richard E. Schauf, Investment Systems, Inc., a Kansas corporation, Construction Systems, Inc., a Kansas corporation, Kan-Fran, Inc., a Kansas corporation, and Development Systems, Inc, a Kansas corporation, *Appellees.*

(449 P. 2d 1010)

Opinion filed January 25, 1969.

*James W. Sargent,* of Wichita, argued the cause, and *Bruce W. Zuercher,* of Wichita, was with him on the brief for appellants.

*Thomas A. Wood,* of Wichita, argued the cause, and *Paul V. Smith, Douglas E. Shay, William C. Farmer, Leo R. Wetta, James R. Schaefer,* and *Larry L. Witherspoon,* of Wichita, were with him on the brief for appellees.

The opinion of the court was delivered by

Fatzer, J.: This appeal arises out of a controversy over the application and alleged violations of the Kansas Securities Act. (K. S. A. 17-1252 *et seq.*) The trial was to the district court which made findings and conclusions, and entered judgment in favor of the

defendant-appellees. The plaintiff-appellants timely perfected this appeal.

The principal events giving rise to this lawsuit occurred in February and March 1966, and involved the plaintiffs, Thomas Allen and Frances Allen, his wife, and the defendants, Richard E. Schauf and Lucille M. Schauf, his wife. Also involved were Mr. and Mrs. George M. Gillen, of Phoenix, Arizona, who formerly lived in Wichita. The Gillens were not parties to the action, but Mr. Gillen testified as a witness for the plaintiffs. The plaintiff, Thomas Allen, married Frances Loop on March 16, 1966, and all reference to Frances Loop prior to that date is made as Frances Allen.

The transactions in question mainly involved the three families who had been friends for some years—a plan to engage in the corporate building and selling of real estate projects through the use of a new building construction method which the Schaufs had been active in expanding, and the sole right to the use of which Lucille Schauf had recently acquired. It was known the Gillens would participate financially in part, and if the Allens did not likewise participate in part, the Gillens would assume full financial participation.

Prior to February 1966, Thomas Allen and Richard Schauf had worked together for several years as tool makers in the same department at Cessna, and Frances Allen had been acquainted with Lucille and Richard Schauf for four or five years. Thomas Allen had also worked with a Mr. Meehan at Cessna, the inventor of a unique patented construction method known as Mee-Strong. Allen had been acquainted with the process for quite some time and considered it an excellent construction method which could save builders money as well as make money for those who used it. Since their first acquaintance, Frances Allen knew that Lucille Schauf had some type of connection with this construction method and knew the Schaufs were interested in building projects of the type involved in this action.

Prior to dates here material, and on or about October 27, 1965, the defendants Lucille and Richard Schauf, and one R. W. Willey incorporated and were the owners of Development Systems, Inc., which was formed to provide consultant and sponsorship services for the development of real estate projects from conception to completion. The corporate office was in Wichita; Willey was president, Richard Schauf was vice president, and Lucille Schauf was

secretary-treasurer. The defendants and Willey had been working with a building construction project in Wellington, Kansas, which was to be financed through the Federal Housing Administration. Their involvement was through Development Systems, and the Wellington project was controlled by one Charles E. Barnett who held the land options for the project and who was dealing with F. H. A. as the sponsor.

On February 21, 1966, the defendants executed, along with R. W. Willey, agreements to incorporate the three corporations here involved, to be known as Kan-Fran, Inc., Investment Systems, Inc., and Construction Systems, Inc., for the purpose of developing the Mee-Strong construction method. The agreements provided, among other things, that the capital stock of each corporation would consist of 1,000 shares of common stock with par value of $100. The agreements further provided that each of the parties had rendered valuable services in connection with the promotion and organization of the business to be incorporated and it was mutually agreed they would receive as compensation for their services the following common stock at par value in each corporation: Kan-Fran, Lucille Schauf 190 shares, Richard Schauf and Willey 180 shares each; Investment Systems, Lucille Schauf 265 shares, Richard Schauf and Willey 255 shares each; Construction Systems, Lucille Schauf 265 shares, Richard Schauf and Willey 255 shares each.

With respect to Kan-Fran, the agreement provided that an option for 225 shares of common stock at par value of $100 per share be granted to the parties as follows: Lucille and Richard Schauf 75 shares each, and Willey 75 shares, the option to be exercised in whole or in part within ten years from February 21, 1966. *The Kan-Fran agreement further provided that 200 shares of common stock would be sold to two other parties at par value of $100 per share,* with the understanding that Lucille Schauf would receive $7,500 for the following: $500 incorporation expenses, $1,000 capitalization fee, and $6,000 for assignment to Kan-Fran of the sole right to use the Mee-Strong construction method in Kansas.

Following the execution of the agreements to incorporate the three corporations, and on February 21, 1966, a meeting of the incorporators was convened to elect the board of directors of each corporation. R. W. Willey was elected president, Richard Schauf, vice president, and Lucille Schauf, secretary-treasurer. At the meeting resolutions were adopted which generally placed into effect the provision of the agreements theretofore executed.

On the same day, February 21, 1966, Lucille Schauf telephoned Frances Allen at her work at Boeing and advised her she had acquired the sole right to the use of the Mee-Strong construction method and was anticipating the formation of some corporations to develop the method and follow it through; that additional capital was needed to make it go faster, and she knew of Mrs. Allen's interest; that if Mrs. Allen was interested, to come visit about it.

On February 23, 1966, Mr. and Mrs. Allen went to the home of Mr. and Mrs. Schauf in Garden Plain, Kansas. At that meeting, the Allens agreed with the Schaufs to invest $10,000 in the venture. Mrs. Allen felt the use of the Mee-Strong construction method would have a great impact on the construction industry and would be the type of thing that could realize some return on her investment. That was the only reason she was interested in investing her money. The record shows that at the February 23, meeting, the Allens were advised of the basic ideas and planned operations of the three corporations. They were told that Lucille Schauf would assign her rights to the use of the Mee-Strong construction method to Kan-Fran for $6,000; that Kan-Fran would be the "mother corporation" and would completely control Investment Systems and Construction Systems, which were associated or subsidiary companies with specific functions, but that all dividends would be paid from Kan-Fran, and that if par value was paid for the shares of stock in Kan-Fran, no money was to be paid for the shares of stock in the other two corporations. The Allens were told there was a need for $20,000 actual cash investment; that the Gillens would invest $10,000, and if the Allens did not desire to invest, the Gillens would invest the $20,000, which would be the only paid-in working capital of the corporations. The Allens were also told that if they did invest, they would receive ten percent of the corporate stock for which they would pay $10,000, which was to be used only in the three corporations, and no money would be transferred to Development Systems. The Allens were further told that Lucille and Richard Schauf would each receive promotional common stock in each corporation for services rendered, and specifically they would receive 190 and 180 shares respectively, of common stock in Kan-Fran. They were also told Willey would receive promotional stock in each corporation and would receive 180 shares of common stock in Kan-Fran.

The record further indicates the Allens were advised the Schaufs and Willey had a stock option which could be exercised at a later

date to acquire stock in Kan-Fran at par value. The reason for the option was, as related by Lucille Schauf, to enable the defendants to put an equal amount of money into the corporations as the other couples. There was evidence that prior to the time the investment was made, Thomas Allen had a chance to study in detail a document prepared by Willey containing the operational plan for Development Systems and the three corporations here involved. The document was prepared after the February 23, meeting and was plaintiff's exhibit 1. The document was termed a "prospectus" by the plaintiffs, but in no sense was it an offering of securities to the public. It was at most, as described by the trial judge, a proposed operational plan.

On March 20, 1966, Frances Allen, by a check signed Frances Loop, and drawn from her individual account, paid Lucille Schauf $10,000 for the common capital stock in each of the three corporations. At that time it was fully understood by the Allens and the Schaufs that the Wellington project did not pertain to the Allens and that they acquired no interest in Development Systems; their investment pertained only to the proposed corporations Kan-Fran, Investment Systems, and Construction Systems. Following the chartering of the three corporations and the filing of the articles of incorporation with the Secretary of State on March 9, 1966, the plaintiffs received certificates for 100 shares of stock in each of the three corporations on or about April 20, 1966, which were issued in the names of Thomas and Frances Allen.

Early in 1966, Lucille Schauf telephoned George M. Gillen in Phoenix, Arizona, and he agreed to invest $10,000 in the three corporations. He stated he and his wife thought the Mee-Strong construction method had a potential since it was something new, easily constructed and economical. He was interested in the method of construction and did not inquire about the corporate structure or the details of how the three corporations would be operated because the Schaufs were his friends and he trusted them. He stated there were to be two parties to purchase stock—he and his wife as one party, and Mr. and Mrs. Allen as the other party—and that each was to invest $10,000 and receive 100 shares of common stock in each corporation.

Subsequent to the Allens' purchase of their stock and prior to April 28, 1966, Thomas Allen was elected president of Investment Systems and Frances Allen was elected secretary. On April 28, 1966, the board of directors of Investment Systems decided to pur-

chase the sponsorship rights of the Wellington project from Charles E. Barnett. The project consisted primarily of land options, contracts and F. H. A. applications which were assigned to Investment Systems on or about that date upon receipt of $2,500.

In connection with the foregoing, and on May 13, 1966, Investment Systems entered into a written contract to pay Development Systems $6,000 for sponsorship services on the Wellington project, payable upon the signing of the contract. On that date, Thomas Allen, as president, and Frances Allen, as secretary, of Investment Systems, signed the contract with Development Systems, and R. W. Willey signed as president and Lucille Schauf attested it on behalf of Development Systems.

Sometime during the latter part of May 1966, the plaintiffs claimed to be dissatisfied with the management of the three corporations and requested an accounting and the minute books and records of Kan-Fran, Investment Systems, and Construction Systems. On a date not disclosed by the record, this action was subsequently filed.

The plaintiffs' amended petition was framed in three counts. The first count claimed a violation of the Kansas Securities Act by the sale of unregistered securities. (K. S. A. 17-1255 to 17-1259.) The second count claimed a violation of the Kansas Securities Act by the sale of securities by means of various misrepresentations of material facts and omissions to state material facts, contrary to K. S. A. 17-1268. Recovery under both counts was sought pursuant to the provisions of the latter statute. The third count claimed misuse of corporate funds but lacked the requisite allegations to support a stockholder's derivative action. Following the defendant's attack on the sufficiency of the third count, the plaintiffs were granted the opportunity to remedy the defect and further amend, but they failed to do so, and the third count for relief was dismissed.

The defendants' answer alleged that registration of the securities sold to the plaintiffs was not required since the sale of the securities in question was an isolated transaction (K. S. A. 17-1262), and denied that misrepresentations or omissions of material facts were made.

Two pretrial conferences were held and two pretrial orders were made. At the trial, the district court stated, "I think our pretrail conference time was wasted" since we failed "to list the misrepresentations charged," and that, "[s]ince the issues were not defined

in detail in the pretrial conference order, the Court is resorting to the pleadings for determination of the issues of this case. Only the issues as stated in the pleadings will be considered."

The misrepresentations or omissions complained of by the plaintiffs were set out in the second count of their amended petition. While the plaintiff Frances Allen did not take the witness stand to testify in her own behalf either during the plaintiffs' case in chief or in rebuttal, the defense rested its case upon the introduction of Mrs. Allen's deposition in which she testified the only untrue statements or omissions to which she made any contention in the lawsuit were those contained in paragraphs a, b, c and d of the second count of the amended petition. In that count the plaintiffs alleged that the defendants, in order to induce the plaintiffs to purchase the stock in question, represented to them the following, which is summarized:

a. That the president of Development Systems was a salaried employee of the corporation; that such corporation would bear all initial operational and administrative expenses of the three corporations here involved, whereas, in truth, Development Systems was only a paper corporation with no capital funds and was incapable of functioning and that the president was being paid no salary because of lack of capital, but instead was being funded for living expenses by Lucille Schauf, personally.

b. That plaintiffs would purchase ten percent of the capital stock and that the defendants and others had or would purchase additional stock, except for 180 promotional shares to be issued to a third party, so as to provide from the sale of at least 570 shares of stock in Kan-Fran at par value, sufficient paid-in working capital for corporate projects. In addition, that Kan-Fran would be the parent corporation with Construction Systems and Investment Systems being wholly owned subsidiaries. In truth, plaintiffs' $10,000 constituted 50 percent of all paid-in capital of the three corporations with additional $10,000 paid in by a third party not connected with the defendants in any way, and, notwithstanding, Lucille and Richard Schauf issued stock to themselves at $100 par value in the three corporations as follows: Kan-Fran 190 and 180 shares, respectively; Construction Systems 265 and 255, respectively, and Investment Systems 265 and 255 respectively, and in addition, unknown to the plaintiffs, defendants had an option for another 225 shares of stock in Kan-Fran; all resulting in the defendants having

complete control of the corporations without having paid into the corporate structure any money contrary to all representations made to the plaintiffs.

c. That Lucille Schauf had in her name a certain valid franchise on a patented method of construction which was purchased by Kan-Fran for the amount of $6,000, said money being a part of the $20,000 paid to Lucille Schauf for the issue of stock in the three corporations, whereas, in truth, the franchise contract was of no value whatsoever, was capable of being revoked by third parties, and that defendants Schauf and others had defaulted in certain contractual provisions so as to render the franchise contract void.

d. That all monies received for stock would be paid into a capital account, whereas, in truth, only $10,000 of the $20,000 received was ever deposited to any of the corporate accounts.

Upon trial, the record indicates the plaintiffs attempted to broaden the issues raised by the pleadings and reflected in the pretrial orders. In their efforts to introduce evidence, the court made rulings excluding certain evidence about which the plaintiffs complained in their statement of points, and are hereafter noted. At the conclusion of the evidence, the district court made oral findings and rendered judgment as follows:

"That the sale of corporate stock to the plaintiffs by the defendants was an isolated transaction under the provisions of K. S. A. 17-1262 and consequently registration of such securities was not required under the provisions of K. S. A. 17-1255.

"That the plaintiffs failed to sustain the burden of proof that the defendants or any of them had offered or sold a security to the plaintiffs by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made not misleading."

Was the sale of the stock to the plaintiffs an "isolated transaction"? The term came into our law in 1957 when the Legislature enacted the present Kansas Securities Act (K. S. A. 17-1252 *et seq.*) and repealed the Securities Act of 1929. The latter Act contained provisions with respect to "isolated sale" and defined that term generally as the sale of a security in the course of repeated and successive sales of the same issue. Decisions from foreign jurisdictions cited by the plaintiffs defining the word "isolated" and interpreting statutes using the words "repeated and successive sales" as used in our former Act, are not helpful since that Act has been repealed.

The question presented is one of first impression and requires a consideration of K. S. A. 17-1262 and pertinent regulations adopted by the securities commissioner.

K. S. A. 17-1262 provides, insofar as it is relevant to this action, as follows:

"Except as hereinafter in this section expressly provided, sections 3 [17-1254] through 9 [17-1260], inclusive, of this act shall not apply to any of the following transactions:

"(*a*) Any isolated transaction, whether effected through a broker-dealer or not.

. . . . . . . . . . . . . .

"(*h*) The issue of stock of a domestic corporation to not exceed ten (10) incorporators: *Provided,* Subsequent transfers of such stock by the owner thereof shall be subject to the provisions of the securities act, except to such extent that the same may be exempt under the terms of subdivision (*a*) of this section."

In passing, we note that subsection (*h*) was amended in 1967 (1968 Supp. K. S. A. 17-1262) to exempt not exceeding fifteen (15) incorporators. The amendment is not applicable to, nor does it control the outcome of this litigation in any way.

Another section of the Kansas Securities Act here pertinent is 17-1270, which reads in part:

"(*a*) This act shall be administered by the securities commissioner of Kansas, who shall be appointed by the state corporation commission, and shall receive such compensation as may be fixed by the state corporation commission.

. . . . . . . . . . . . . .

"(*f*) The commissioner may from time to time make, amend, and rescind such rules, regulations and forms as may be necessary to carry out the provisions of this act. In prescribing rules, regulations and forms, the commissioner may cooperate with the securities administrators of the other states and the securities and exchange commission with a view of effectuating the policy of this state to achieve maximum uniformity in the form and content of registration statements, applications, and reports wherever practicable. All rules, regulations and forms of the commissioner shall be published. *No provision of this act imposing any liability applies to any act done or omitted in good faith in conformity with any rule, regulation, form, or order of the commissioner, notwithstanding that the rule, regulation, form or order may later be amended or rescinded or be determined by judicial or other authority to be invalid for any reason* . . ." (Emphasis supplied.)

At the time of the transactions in question, the securities commissioner had adopted and published regulations pursuant to the statute. (17-1270 [*f*].) These regulations are filed with the Revisor of Statutes (1968 Supp. to K. S. A. 77-415 *et seq*), and are not shown to have been disapproved by the Legislature. Volume 2, Kansas

Administrative Regulations, 81-1-1 then provided and now provides in part as follows:

"Definition of terms. As used in these rules and regulations, and in the forms, instructions and orders of the securities commissioner, the following meanings shall apply, along with those which may hereinafter appear, to the extent that they are not inconsistent with the definitions provided by 17-1252 of the Kansas securities act or unless context otherwise requires:

. . . . . . . . . . . . . . .

"Isolated transaction. A security or securities shall be deemed to have been sold by a seller in an isolated transaction, whether effected through a broker-dealer or not, where the number of persons solicited in this state in any one 12-month period on behalf of such seller with respect to such securities shall not exceed four."

No contention is made that the regulation is void as going beyond the legislative authorization, and in their brief the plaintiffs impliedly recognize its validity. (1968 Supp. 77-425.) In defining "isolated transaction" as not exceeding four persons solicited, the securities commissioner may have given consideration to *Elting v. Pickett,* 190 Kan. 54, 64, 372 P. 2d 261, where it was held that separate sales of an undivided $\frac{1}{32}$d working interest in four separate oil and gas leases were isolated transactions under the former statute. (G. S. 1949, 17-1225 [1].) Be that as it may, where statutory enactments create a situation where official duties which must be performed which are not clearly defined or prescribed in detail, the operative interpretation given thereto by the officers and official boards whose duties are to carry the legislative policy into effect is helpful, and may be entitled to controlling significance. (*Southwestern Bell Telephone Co. v. Employment Security Board of Review,* 189 Kan. 600, 607, 371 P. 2d 134, 93 A. L. R. 2d 1312, and cases cited.) The general rule is sound and in this case the securities commissioner was directed by the Legislature to adopt regulations to carry the Act into effect. As indicated, the Act expressly provides that none of its provisions imposing any liability applies to any act done or omitted in good faith in reliance upon the commissioner's regulations notwithstanding they may later be determined to be invalid. We do not pass upon the wisdom of Regulation 81-1-1, but if it is applicable to the transactions in question, we are of the opinion the defendants were entitled to rely upon its provisions defining an "isolated transaction."

The defendants assert the evidence was undisputed that there were only two persons who were solicited and to whom stock was sold. One of the persons solicited was Frances Allen to whom stock

was sold in the state of Kansas, and the other was George M. Gillen of Phoenix, Arizona, who was solicited and sold stock by means of a telephone call from Lucille Schauf in Wichita to Phoenix. They argue they are not liable for the sale of unregistered securities as a matter of law, and contend the commissioner's regulations exempt the transactions involved because there were less than four solicitations in number.

The plaintiffs contend that Regulation 81-1-1 is not applicable under the facts and circumstances of this case and that the defendants' contention does not conform to the legislative intent in 17-1262. They argue that the sale of the stock in question was by the corporation, and that giving the defendants the benefit of all presumptions of counting the Allens and the Gillens as only two persons solicited instead of four, and forgetting about the other two corporations, still there were transactions involving the issuance of stock to not less than five persons, namely: Lucille Schauf, Richard Schauf, R. W. Willey, the Allens, and the Gillens.

We think the plaintiffs misconceive the effect of transactions exempted from registration by 17-1262. Whether a particular transaction comes within the provisions or exemptions of an act regulating the sale of securities depends on the language of the statute and the nature and effect of the transaction. (53 C. J. S., Licenses, § 76, p. 767.) Insofar as here applicable, the statute clearly grants two types of exemptions. The first under subsection $(a)$ as being an isolated transaction whether effected through a broker-dealer or not, and the second, to stock isssued to the incorporators of a domestic corporation of not exceeding ten, now fifteen, in number. Conceding, as the plaintiffs do, that five persons were issued stock, the statute (17-1262 [$h$]) provides that the stock issued to the incorporators Lucille Schauf, Richard Schauf and R. W. Willey was expressly exempt from registration, there being less than ten in number, thus leaving only the two transactions involving the plaintiffs and the Gillens to be measured by Regulation 81-1-1. No contention is made that the Schaufs or Willey sold the plaintiffs stock which was isssued to them as incorporators, thus requiring consideration of the proviso in subsection $(h)$.

The plaintiffs basically contend that the sale of the stock by the corporation was not exempt under subsection $(a)$ of the statute. The transaction in question was not effected through a broker-dealer as defined in 17-1252 $(c)$, but was effected by the corporation's sale of stock at par value in Kan-Fran through Lucille Schauf.

We are of the opinion the exemption afforded by subsection (*a*) is available to the corporation which, according to the plaintiffs, isssued the stock, and since such issuance involved only solicitation and sale of stock to two persons, the two transactions are deemed to be "isolated" within the intent and purpose of 17-1262 and the commisssioner's regulations. In view of the foregoing and since the exemption afforded by 17-1262 (*h*) does not preclude an exemption under subsection (*a*), it is held there was no violation of the Act for the sale of unregistered securities.

As indicated, the plaintiffs rely upon 17-1268 for recovery under the second count of their amended petition. The statute creates a civil liability where a person:

". . . offers or sells a security . . . by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading . . ."

The first essential element for recovery under the statute is that the person selling the security makes an untrue statement of a material fact or an omission to state a material fact. Materiality was defined in *McGuire v. Gunn*, 133 Kan. 422, 300 Pac. 654, as follows:

"A representation is material where it relates to some matter which is so substantial and important as to influence the party to whom it is made. (14 C. J. 602, 605.)"

See, also, Restatement of the Law, Restitution, Sec. 8 (2), p. 32.

It is at this point where the plaintiffs' evidence failed. The district court found they had failed to sustain the burden of proof that the defendants or any of them had offered or sold stock to the plaintiffs by means of any untrue statement of a material fact or omission to state a material fact. If there is substantial evidence to support the district court's finding on this point, an affirmance of the judgment is required unless trial errors prejudicial to substantial rights of the plaintiffs occurred. Our cases are legion on that point. An appellate court is not concerned with the credibility of witnesses or the weight of their testimony. It is concerned only with evidence which supports a district court's findings of fact and not with that tending to support a contrary conclusion. In *Denison Mutual Telephone Co. v. Kendall*, 195 Kan. 227, 230, 231, 403 P. 2d 1011, it was said:

". . . it should be noted that in an action springing from alleged false representations, an appellate court, by force of circumstances usually attendant

upon a trial of such an action, must give considerable weight to the findings and conclusions of the trial judge who had an opportunity to observe the demeanor of the principals on the witness stand. Moreover, it has long been settled that if there is present in the record substantial competent evidence in support of the findings of the trial court, it is beyond the province of this court to disturb the judgment on appeal. (*Fine v. Neale Construction Co.*, 186 Kan. 537, 352, P. 2d 404; *Green v. Kensinger*, 193 Kan. 33, 392 P. 2d 122.)

.    .    .    .    .    .    .    .    .    .    .    .    .    .

".  .  . It is the duty of the trier of the facts, not the appellate court, to weigh conflicting evidence; and the appellate court, in determining the sufficiency of evidence to support findings of fact, is required to view all testimony in the light most favorable to the prevailing party. (*Kramer v. Farmers Elevator Co.*, 193 Kan. 438, 393 P. 2d 998; *International Motor Rebuilding Co. v. United Motor Exchange, Inc.*, 193 Kan. 497, 501, 393 P. 2d 992.) This court is concerned only with whether or not there was any substantial competent evidence to support the trial court's finding and conclusion that plaintiffs failed to sustain the burden of proof that Kendall made any false representations. .  .  ." (l. c. 230, 231.)

See *Renner v. Monsanto Chemical Co.*, 187 Kan. 158, 168, 354 P. 2d 326, and also our recent cases of *Griffin v. Price*, 199 Kan. 649, 651, 433 P. 2d 464, and *Sherbert v. Mall*, 200 Kan. 87, 88, 434 P. 2d 549.

Was there substantial evidence to support the district court's findings? It would serve no useful purpose to review in detail the testimony of each of the witnesses. Portions of their testimony have heretofore been summarized in accordance with the rule that it is of no consequence that there may have been contrary evidence adduced at the trial which, if believed by the district court, would have compelled entirely different findings of fact and an entirely different judgment. It is evident the district court believed the testimony of Lucille Schauf and found that the plaintiffs were not misled in any respect and had a good understanding of the entire arrangement. This is confirmed by significant portions of the district court's oral findings from the bench at the conclusion of the trial. The court stated:

".  .  . Because the people who entered into the transaction had a *good* general nature of the plan, all they were doing was investing in a plan—in an idea that was being proposed. In fact, Exhibit 1 is nothing more than that. It hardly can be said to be a statement of facts—a projection. What we hoped to accomplish—and that is what was invested in here—we would have to conclude the Allens made up their minds to invest in the project at the meeting of February 23rd. This is not disputed any longer and at that point it was just a plan—just an idea largely. *There were a few facts in existence then but I couldn't say the facts in existence on that date were material facts.* Whether we accept the reason plan theory which has been advanced by the plaintiffs or

the value of the stock theory which has been advanced by the defendants, or some other theory, *the idea was quite well known.* To accept the plaintiffs' theory here, we would have to talk about misrepresentation of facts which appeared later *and which may point more to a disagreement or dissatisfaction with management* than to misrepresentation or omission of material facts in existence on the day that the investors decided to invest. (Emphasis supplied.)

With respect to paragraph "a" of the second claim for relief, there was evidence that Willey, the president of Development Systems, was a salaried employee of the corporation. As to whether that corporation would bear initial operational and administrative expenses of the three corporations, Allen testified that the Schaufs told him and Mrs. Allen the corporation would bear all such expenses and that no money would be needed from the three corporations for that purpose. Lucille Schauf testified that she told the Allens that Development Systems already had the office, telephone, etc., set up which could be used in connection with the corporate work of Kan-Fran and the other two corporations. This administrative expense was recognized by Mrs. Allen in her deposition. No evidence was offered by the plaintiffs to show that this representation was not true.

While various contentions are made with respect to representations that the Wellington project had received the approval of F. H. A., there was no mention of such a representation in the plaintiffs' amended petition. Be that as it may, Mrs. Allen testified in her deposition she made no claim to misrepresentations or omissions other than stated in her amended petition. Moreover, the Allens testified they fully understood they were acquiring no interest in Development Systems.

The principal issue at the trial related to the issuance of common stock in Kan-Fran to Lucille Schauf and Richard Schauf. During the trial it was stipulated that the plaintiffs made their investment knowing that Lucille Schauf and Richard Schauf would be issused 190 and 180 shares, respectively, of common stock in Kan-Fran at par value, and that they paid no cash to the corporation for the stock. The only issue then was whether the Schaufs told the Allens they would receive the stock in those amounts as promotional stock for services rendered and pay no cash for it. On this point there was sharp conflict in the testimony. Thomas Allen testified they were not told that the Schaufs were not paying money for their stock, and, further, that the Schaufs had an option to purchase additional stock. On the other hand, Mrs. Schauf testified the Allens

were willing that Mrs. Allen make the investment only if the Schaufs had corporate control, and that she told the Allens at the February 23, meeting she and Richard were taking promotional stock and were paying nothing for it, and also that they had an option to purchase additional 75 shares each, in Kan-Fran.

It was within the province of the district court, who saw the witnesses and observed their manner and demeanor on the stand, to assess the weight and value of their testimony. (*Collins v. Merrick,* 202 Kan. 276, 448 P. 2d 1.) The fact that Frances Allen did not take the witness stand to testify permitted the district court to legitimately presume that her testimony would be unfavorable to her own cause. (*Henks v. Panning,* 175 Kan. 424, 430, 431, 264 P. 2d 483; *Ratzlaff v. Friedeman Service Store,* 195 Kan. 548, 551, 407 P. 2d 513.) Be that as it may, there was ample substantial evidence to support the findings of the district court that the defendants had not offered or sold the stock by means of any untrue statements or omissions to state a material fact. This in itself precludes recovery under the statute, and warrrants no discusssion of the effect or application of its provisions.

The plaintiffs contend it was error not to consider facts and events occurring between February 23, and March 20, 1966. The plaintiffs' brief fails to state and the record fails to disclose any specific representation claimed by any witness to have been made after February 23, which was not also claimed by the witness to have been made on or before February 23. The plaintiffs reproduced in their brief, excerpts from the district court's extemporaneous oral findings to which they supplied emphasis. Those oral findings have heretofore been set forth. Emphasized in the manner there quoted, the court's statement reveals that the source of the plaintiffs' complaints were about the management of the corporation contained in their third cause of action, which was dismissed. We perceive no prejudicial error in this respect.

The plaintiffs urge it was error to rule that a shift in corporate control was not material. It is claimed the defendants admitted that the plaintiffs were not told of the increased number of shares to be issued to Lucille and Richard Schauf in Investment Systems and Construction Systems. The record reflects that to be the case. But there was never any issue concerning the fact that the Schaufs in fact had control of the corporations. As indicated, the Allens would not invest unless the Schaufs had corporate control, and

they knew of the Schaufs' option to purchase additional stock in Kan-Fran. Likewise, they were informed that Kan-Fran was the key corporation of the three, and held the Mee-Strong franchise; that it controlled the other corporations and the payment of dividends, and that if they paid par value for their stock in Kan-Fran, they would pay nothing for their stock in the other corporations. Those facts were uncontradicted. As indicated, the district court obviously believed the testimony of Lucille Schauf and found that the plaintiffs were not misled and had a good understanding of the arrangement. Any effort by the plaintiffs to persuade this court on appellate review to substitute its judgment for that of the district court as to whose testimony to believe is an ingenious but fruitless argument.

It is contended the district court erred in excluding plaintiffs' Exhibits 3, 4, 12 and 13. Exhibit 3 was the minutes of a directors' meeting of Development Systems in November 1965, which, it is claimed, would have revealed the defendants wanted to take money from the corporation as soon as it came in to repay loans made by them. The evidence was speculative at most; the directors' meeting occurred long prior to the incorporation of the three corporations here involved. Moreover, it was not really material; the plaintiffs purchased no stock in Development Systems and the only relationship they had to that corporation was that an office with a telephone was available for the use of the other corporations. At the time of the plaintiffs' investment, Development Systems was involved with Barnett in the Wellington project and there was evidence the plaintiffs knew they had no interest or involvement in that project. It is contended the Allens were told no money would be transferred to Development Systems. That was the case until Investment Systems, acting through Thomas Allen as president, and Frances Allen as secretary, entered into a written contract with Development Systems to pay the latter corporation $6,000 as a service fee in connection with the Wellington project which had been purchased by Investment Systems. Obviously, that transfer of funds was made possible by the plaintiffs' own voluntary act. Exhibit 4, had it been admitted, would have disclosed that $2,500 was paid to Barnett to purchase his interest in the Wellington project. Action to purchase Barnett's interest was taken by the Board of Directors of Investment Systems of which the plaintiffs were president and secretary. As previously indicated, evidence of that character was before the

district court and clearly the error, if any, was not prejudicial and did not affect the substantial rights of the plaintiffs. Exhibits 12 and 13 were statements of expenses and disbursements which in effect related to the plaintiffs' third cause of action. What happened to the money was not an issue after the plaintiffs abandoned their third claim for relief. However, it is claimed that Exhibit 13 would have revealed that Lucille Schauf was advancing money to Development Systems and was also paying the salary of Willey as president. There was evidence that money was loaned to Willey from Development Systems, but there was no evidence it was for his living expenses. We cannot overlook there was a general finding in favor of the defendants, and such a finding determines every controversial question of fact in support of which evidence was introduced. A general finding of fact by a district court raises a presumption that it found all facts necessary to sustain and support the judgment and such a finding will not be disturbed on appeal if there is substantial, though controverted, evidence to sustain it.

It is further claimed the district court limited the plaintiffs' examination of Lucille Schauf as to services the defendants rendered in exchange for the stock. There was evidence that prior to February 1966, $25,000 had been paid for the Mee-Strong construction franchise and Lucille Schauf sold the process to Kan-Fran for $6,000. The district court gave the plaintiffs considerable latitude in examining Lucille Schauf concerning the services rendered by the Schaufs for the corporate stock issued to them. However, that was not really an issue in the trial. As indicated, it was stipulated the Allens knew the number of shares of stock to be issued to the defendants in Kan-Fran and that they would pay no money to the corporations for it. There was conflicting evidence on the point, but the district court obviously believed the defendants' testimony. Again, this point was resolved by the court's finding (K. S. A. 60-252 [a]).

The plaintiffs lastly contend the district court erred in excluding the written interrogatories submitted by the plaintiffs to Lucille Schauf and her answers thereto. At the close of the trial, the plaintiffs moved to make those interrogatories and answers a part of the evidence. The interrogatories pertained to the question whether Development Systems had obtained the F. H. A. approval for the Wellington project. The court refused to admit the interrogatories.

We agree with the plaintiffs that as an abstract proposition, an-

swers to interrogatories are legitimately subject to consideration by the trier of the facts. (K. S. A. 60-226 [d] and 60-233.) However, to be entitled to consideration, the answers must be material and relevant. In this case the answers to the interrogatories pertain solely to the F. H. A. approval of the Wellington project. That was not an issue raised by the pleadings, nor was it reflected in the pretrial orders, and was not an issue in the lawsuit. There was no fundamental error in the district court's ruling excluding the interrogatories.

Other points have been urged by the plaintiffs. We wish to state none of those contentions have been overlooked. Each has been given careful consideration. It is not enough to disturb a judgment that some error or impropriety transpired during a trial, and error, standing alone, does not raise a presumption of prejudice. Reversal is proper only where it is affirmatively established that the error prejudicially affected the substantial rights of the defeated party. (*Collins v. City Cab Co.*, 192 Kan. 394, 388 P. 2d 597.) In *Home Ins. Co. v. Atchison, T. & S. F. Rly. Co.*, 189 Kan. 316, 369 P. 2d 338, it was said:

". . . The law does not guarantee to every litigant a 'perfect' trial. (*State v. Severns*, 184 Kan. 213, 222, 336 P. 2d 447.) It does, however, guarantee to him a fair *trial*—and there is nothing in the record to indicate that such was not had in this case. In *Cook v. Railway and Bridge Co.*, 101 Kan. 103, 165 Pac. 803, it was said:

" '. . . It is not enough to disturb a judgment that some error or impropriety transpires in a trial. It is necessary that the appellant go further and show that the matter complained of prejudicially affected the net result.' (pp. 105, 106.)" (l. c. 319, 320.)

The district court's determination of the facts is supported by substantial evidence and since the sale of the stock has been determined to be an isolated transaction under the statute and pertinent regulations, we affirm the judgment of the district court.