Dean **WOODS**, and all other persons similarly situated, the City of Pittsburg, Kansas, Rensmeyer & Jones, a Kansas Partnership, Ernest Jones, Edwin A. Rensmeyer, and All Enterprises, Inc., Plaintiffs,

v.

**HOMES AND STRUCTURES OF PITTS-BURG, KANSAS, INC.,** a corporation; Bruce Shipley, Grant A. Murray, Nationwide Equipping Company, a corporation, Herbert Bost, Fred W. Rausch, Jr., F & M Bank and Trust Company, Alexander & Allen Inc., a corporation, H. Willima Alexander, R. J. Allen, Tom Preston and All Enterprises, Inc., John J. McQueen, Charles Menghini, Computer Consultants, and Joe Cox, Defendants.

Civ. A. No. 75–62–C2.

United States District Court,
D. Kansas.

April 22, 1980.

Roger J. Nichols, Los Angeles, Cal., Leo L. McCormick, Los Altos, Cal., Larry Austin, Overland Park, Kan., J. Michael Rediker, Ritchie & Rediker, Birmingham, Ala., Michael E. Waldeck, Niewald, Risjord & Waldeck, Kansas City, Mo., John E. Shamberg, Richard W. Byrum, Schnider, Shamberg & May, Shawnee Mission, Kan., for plaintiffs.

Fred Rausch, Jr., Topeka, Kan., Donald L. Allegrucci, Pittsburg, Kan., Boone, Ellison & Smith, Tulsa, Okl., John A. Price, Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan., James Borthwick, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., N. Jack Brown, Boddington & Brown, Joseph McDowell, McDowell, Rice & Smith, Kansas City, Kan., Roger W. Penner, Griffin, Dysart, Taylor, Penner & Lay, Kansas City, Mo., R. W. Niederhauser, Caenen & Niederhauser, Chartered, Mission, Kan., George A. Lowe, Lowe, Terry & Roberts, Olathe, Kan., for defendants.

John J. McQueen, pro se.

TABLE OF CONTENTS

I INTRODUCTION .......................................... 1275

II ALLEGED VIOLATIONS OF FEDERAL SECURITIES LAWS ........ 1277

 A. Rule 10b–5 and Section 10(b) of the 1934 Act .................... 1277
 1. F & M Bank ......................................... 1277
 2. City of Pittsburg .................................... 1280
 3. Rausch and Menghini .................................. 1282
 4. Computer Consultants and McQueen ......................... 1284
 B. Section 17(a) of the 1933 Act ................................ 1284
 C. Section 12(2) of the 1933 Act ................................ 1288
 1. The Section 13 Statute of Limitations ....................... 1288
 2. The 1933 Act Securities Exemption for Tax Exempt Bonds ...... 1290
 3. The Effect of a Guarantee on Municipal Bonds ................ 1292

**1275**

II ALLEGED VIOLATIONS OF FEDERAL SECURITIES LAWS—Continued

 C. Section 12(2) of the 1933 Act—Continued

 4. Privity ............................................... 1294

 5. Notices of Claim, Pleading Conditions Precedent, Immunity and
the Tenth Amendment ................................. 1295

III ALLEGED VIOLATIONS OF STATE LAW ....................... 1297

 A. Propriety of Applying Kansas Law ........................... 1297

 B. Pittsburg's General Defenses to the State Law Claims ............. 1298

 C. Pittsburg's Motion for Summary Judgment on the Breach of Contract
Claim ...................................................... 1300

IV SUMMARY ................................................. 1301

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

## I. INTRODUCTION

This action is presently before the court on motions to dismiss and for summary judgment filed by the defendants F & M Bank and Trust Company, Fred W. Rausch, Jr., Charles Menghini, City of Pittsburg, Computer Consultants, Inc., and John J. McQueen. We certified a plaintiff class in our order of July 16, 1979. The class is defined to include "all purchasers of the State of Kansas, County of Crawford, City of Pittsburg Industrial Development Revenue Bonds Series AA 1973." The definition excludes: (1) all defendants, (2) common stock shareholders of defendants, whether they acquired such stock before or after the issuance of the Pittsburg Bonds, (3) all persons who acted as issuers, underwriters or dealers in connection with the issuance of the Pittsburg Bonds, and (4) all employees of such issuers, underwriters or dealers who personally participated in such issuance. Notices were sent to the class members and the clerk's office reports that no requests for exclusion were received. Additionally, the court permitted Irwin Fiesler to intervene as a plaintiff in this action. Fiesler filed a complaint on November 19, 1979, that in large part tracks the third amended complaint of the plaintiff class that was submitted on March 15, 1978. Fiesler's complaint is not specifically at issue in the motions now before us.

The class complaint asserts the following claims:

Count I Securities Violations of Rule 10b–5, Section 10(b) of the Securities Exchange Act of 1934 and of Section 17(a) of the Securities Act of 1933.

Count II Securities Violations of Section 12(2) of the Securities Act of 1933.

Count III Violation of the Kansas Securities Act, K.S.A. 17–1253.

Count IV Violation of the Kansas Securities Act, K.S.A. 17–1255.

Count V Violation of the Kansas Securities Act, K.S.A. 17–1268.

Count VI Fraud.

Count VII Negligence.

Count VIII Punitive and Exemplary Damages.

Count IX Breach of Contract.

Count X Willful and Wanton Misconduct.

Count XI Action for an Accounting.

The defendants specifically mentioned above have filed motions to dismiss or motions for summary judgment related to some or all of the plaintiffs' claims. Suggestions in support and in opposition, depositions, documentary exhibits and affidavits have been received. More often than not the defendants have adopted each other's motions and suggestions. While we may refer to the specific party that raises a particular ground, we have applied the grounds raised to all appropriate parties.

We have set out below facts that appear undisputed. We have taken a very conserv-

ative approach in stating these facts to provide a framework upon which the disputed details may be placed. Prior to trial we expect the parties to stipulate to undisputed facts. This will aid the court and jury immeasurably in understanding the basic events and concentrating on the areas of controversy.

This action arises out of the issuance and sale of some Pittsburg, Kansas industrial development bonds. On November 20, 1973, a bond ordinance prepared by Fred Rausch, bond counsel, was passed by the city governing body. The ordinance authorized and directed the issuance of $900,000 of the bonds. The bonds were issued to finance the construction of a manufacturing facility in Pittsburg. Homes & Structures of Pittsburg, Kansas, Inc., was to build modular home components at the facility. Homes & Structures entered into a lease and agreement with the City on or about November 27, 1973. The revenue from the lease of the land and manufacturing plant was to finance the payment of interest and principal to the bondholders. Herbert Bost, President of Homes & Structures, personally guaranteed the tenant company's rent. In addition, some people were led to believe that the underwriter's obligation to pick up the bonds and the payment of principal and interest on the bonds were guaranteed by a surety bond of Windsor Insurance Company, Ltd.

The underwriter who agreed to market the industrial development bonds was Alexander & Allen, Inc. (hereafter "A & A"), a corporation organized under and by virtue of the laws of the State of Florida, with its principal place of business in Florida. Pursuant to a September 28, 1973 investment banking or underwriting agreement, Homes & Structures and A & A agreed that A & A would "purchase or cause to be purchased said issue within 90 days of completion of same for a price not less than 80 cents per dollar. . . ." In fact, A & A received a 15% discount from the face value of the bonds.

The bond issue closed on December 6, 1973, at the F & M Bank and Trust Company in Tulsa, Oklahoma. At that time F & M signed an "acceptance of trust and duties of trustee and paying agent form" and executed a receipt for $900,000.00 of industrial revenue bonds. No money changed hands on December 6, 1973. Menghini, city attorney for Pittsburg, objected to the piecemeal delivery over a ninety-day period, the fifteen percent discount and the sale of the bonds without charging accrued interest; the bond counsel approved these practices. F & M arranged to deliver the bonds as needed to Barnett Bank of Florida which, in turn, would deliver the bonds to A & A upon payment of 85% of the face value. On December 11, 1973, F & M started sending bonds to the Barnett Bank for delivery to A & A. At the end of the ninety-day period some of the bonds had not been picked up. The final proceeds from the sale of all of the bonds were received by F & M on May 13, 1974.

In accordance with the bond ordinance requirements for the trustee and paying agent, F & M was to collect the proceeds of the sale of the bonds and: (1) pay into a principal and interest account the sum of $120,675.00 as capitalized interest; (2) immediately pay the purchase price of the land upon which the facility was to be constructed; (3) establish a construction fund with remaining proceeds to be used for constructing and equipping the manufacturing plant, warehouse and office; and (4) disburse the funds deposited in the construction fund upon written instructions from the project manager specifying the amounts to be disbursed and the persons to whom such disbursements were to be made. After the payment of the cost of purchasing the land and constructing the facility, warehouse and office, F & M was to transfer the remaining construction fund balance to the principal and interest account. In addition, all monies due under the lease and agreement from Homes & Structures were to be paid to F & M and deposited in the principal and interest account. From this account the bank was to pay the principal and interest of the bonds as they matured.

As payment was received for the piecemeal sale of the bonds, the bank invested and disbursed the funds.

At the end of November 1974, Homes & Structures defaulted on its payment of rent. The City filed an action for forcible entry and detainer to recover possession of the leased premises (security for the $900,-000.00 industrial development bonds). Due to the default, F & M filed two suits on behalf of the bondholders. One suit sought recovery of the sum of $116,755.80 from Grant Murry, a principal and plant manager of Homes & Structures. This action alleged that Murry unlawfully and fraudulently obtained funds by approving requisition payments to Nationwide Equipping Company, a company that Murry controlled. The second action was filed against Bost, as guarantor, seeking recovery of unpaid rentals guaranteed by Bost in the sum of $1,925,775.00. Although default judgment was entered against Bost on October 1, 1975, attempts to locate Bost have been unsuccessful. Additionally, Windsor Insurance Company, purported guarantor of the bond principal and interest, has not fulfilled its obligations and cannot be located.

When this action began, F & M held $48,700.00 in remaining proceeds of the bond issue and accrued interest. By our order the funds were paid into court. A portion of those funds has been used to maintain insurance on the property in Pittsburg, Kansas. The funds have been invested in interest-bearing certificates of deposit for the benefit of the bondholders. By our order of January 25, 1978, the City was permitted to enter into a lease and option to purchase for this property. All sums generated by the agreement have been paid into court. The total of the rental funds now held by the court exceeds $100,000.00.

With the above-stated facts in mind, we will address the defendants' pending motions.

## II. ALLEGED VIOLATIONS OF FEDERAL SECURITIES LAWS

A. *Rule 10b–5 and Section 10(b) of the 1934 Act.*

Plaintiffs' first count alleges violations of both the 1934 Act, Section 10(b), Rule 10b–5 and the 1933 Act, Section 17(a). We shall direct our primary attention to the Rule 10b–5 claim.

We note that federal securities antifraud law has primarily developed in the area of corporate securities rather than municipal securities. Furthermore the municipal securities involved here are industrial development bonds as opposed to general obligation bonds of a city. The market and the regulations for industrial development bonds are sufficiently distinguishable from the corporate securities market and regulations that we must be cautious in applying law that has emerged in the corporate securities arena. The role of each of the participants in the Pittsburg issue may involved duties that do not directly correspond to the duties of participants in a corporate offering. The Tenth Circuit has noted in a related industrial development bond case that the legal responsibilities of bond lawyers and banks acting as escrow holders are new and relatively undeveloped issues. *Cronin v. Midwestern Oklahoma Development Authority*, 619 F.2d 856 (10th Cir.1980). We believe it is extremely important to focus on issues of industrial development bonds in these motions now before us and at trial. The common and accepted practices that have developed in issuing industrial development bonds would seem important in making proper inferences from the conduct of the defendants. Disputes as to the duties of participants in issues of industrial development bonds will require full development at trial.

As to the law governing Rule 10b–5 claims generally, we suggest that counsel refer to our recent opinion in *Seiffer v. Topsy's International, Inc.*, 487 F.Supp. 653, at pages 662–669 and 702–706 (D.Kan.1980).

1. *F & M Bank's Motion for Summary Judgment on the Rule 10b–5 Claim.* At the heart of the dispute over the Rule 10b–5 claim asserted against F & M Bank is the bank's role in the bond transactions. If the bank was acting as a mere transfer agent for the bonds and their proceeds, no 10b–5 liability attaches. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152,

92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). On the other hand, the bank may be subject to primary liability for Rule 10b–5 violations if it owed a direct duty to the public. *Cronin v. Midwestern Oklahoma Development Authority, supra.* The bank could also be found secondarily liable under an aiding and abetting theory if it has sufficient knowledge of and participation in the Rule 10b–5 scheme. *Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38 (2nd Cir. 1978); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir. 1975).

■ Plaintiffs contend that the bank is primarily liable because it had a duty to disclose material misrepresentations and omissions directly to the bondholders. If true, silence or inaction could lead to a finding of Rule 10b–5 liability. *Kerbs v. Fall River Indus., Inc.,* 502 F.2d 731, 739–40 (10th Cir. 1974). The trustee bank maintains that it had no duty of disclosure to the bond purchasers. *Resource Investors v. Natural Resources Inv. Corp.,* 457 F.Supp. 194, 200 (E.D.Mich.1978). However, the Tenth Circuit recently reversed a trial court's entry of summary judgment for a trustee bank on this issue. *Cronin, supra.* The court indicated that participation in the issuance of the bonds could result in a duty of disclosure to all buyers. The ultimate determination on the duty of disclosure must await trial.

Plaintiffs also contend in their memorandum opposing summary judgment that the bank was a primary violator of Rule 10b–5 because of its alleged gross mismanagement of the bond proceeds. Standing by itself the alleged mismanagement would not violate Rule 10b–5. *See, e. g., Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). However, mismanagement for the purpose of diverting the gathered funds to primary Rule 10b–5 violators could provide the "knowing and substantial assistance" necessary for imposing liability under aiding-abetting or conspiracy theories. Of these only aiding-abetting is alleged.

■ Other allegations of wrongdoing on the part of F & M are appropriate to an aiding-abetting theory and a few comments on the theory seem appropriate. The elements of aiding and abetting in a Rule 10b–5 violation are: (1) proof of securities law violations; (2) proof that the alleged aider-abettor knew of the violations and of its role in the scheme; and (3) proof that the alleged aider-abettor knowingly and substantially assisted in the violation. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir. 1975); *Seiffer, supra,* at 667–669. In relation to the knowledge requirements of aiding-abetting, we note the Fifth Circuit's statement in *Woodward, supra,* at 95: "The scienter requirement scales upward when activity is more remote; therefore, the assistance rendered should be both substantial and knowing. A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud." The Fifth Circuit states further at 97:

When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter. *Cf. City National Bank v. Vanderboom,* 8 Cir. 1970, 422 F.2d 221, *cert. denied* 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560; *accord, Vohs v. Dickson,* 5 Cir. 1974, 495 F.2d 607, 621–22; *Clement A. Evans & Co. v. McAlpine, supra,* [5 Cir.] 434 F.2d [100] at 103. In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability. In any case, the assistance must be substantial before liability can be imposed under 10b–5.

Plaintiffs and F & M agree that establishing recklessness might be sufficient to

satisfy the scienter requirement for aiding and abetting liability if the bank had a fiduciary duty to the bondholders. *Rolf v. Blyth, supra*, at 44. Without proof that F & M had a duty of disclosure, the standard of scienter plaintiffs will be required to meet will be one of conscious intent. Without a duty to disclose, imposition of secondary liability using a standard of recklessness or a "should have known" test would effectively mean liability for negligence. This would contravene the rule of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). For further analysis of the scienter requirement in secondary liability cases, we commend David S. Ruder's article *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy*, in Pari Delicto, *Indemnification, and Contribution*, 120 U.Pa. L.Rev. 597 (1972) to the attention of counsel.

While we hope the above comments may be helpful to counsel in settlement negotiations and at trial, the present concern is the bank's motion for summary judgment. Rule 56 requires summary judgment to be "rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Tenth Circuit has offered the following guidelines for the rule:

> Summary judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir. 1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33 (10th Cir. 1975). The courts must consider factual inferences as tending to show triable issues of material facts in the light most favorable to the existence of such issues in assessing a motion for summary judgment. *Dzenits v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 494 F.2d 168 (10th Cir. 1974). Pleadings and documentary evidence must be construed liberally in favor of the party opposing such a motion. *Har-*

*man v. Diversified Medical Investments Corporation*, 488 F.2d 111 (10th Cir. 1973), cert. denied, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). When a motion for summary judgment is made and supported by depositions and documents, as here, the adverse party may not rest upon the mere allegations but his response, by affidavit or otherwise, must demonstrate, by specific facts, that there is a genuine issue for trial. Fed.Rules Civ.Proc. rule 56(e), 28 U.S.C.A.; *Ando v. Great Western Sugar Co.*, 475 F.2d 531 (10th Cir. 1973).

*Bankers Trust Company v. Transamerica Title Insurance Company*, 594 F.2d 231 (10th Cir. 1979).

The same summary judgment standards apply without regard to the complexity of the case.

The defendant bank has done a commendable job in attempting to meet the heavy burden of showing that no material facts remain in dispute. The suggestions submitted by F & M demonstrate a good understanding of both securities law and the requirements for summary judgment. Furthermore, many of the plaintiffs' allegations are without evidentiary support. For instance, we find no evidence that the bank was aware of the Windsor guarantee of the principal and interest of the bond issue at the time of the bond sales, or that the bank knew that the plant manager had an interest in Nationwide Equipping Company. However, some material facts remain disputed so that summary judgment would be improper. Specifically, a fact finder could reasonably draw inferences supporting a finding that the bank acted as an aider-abettor from certain conduct of the bank that was contemporaneous with the sale of the bonds. The bank permitted the underwriters approximately sixty additional days to pick up and pay for the bonds. This was beyond the ninety days allowed by the bond ordinance and bond counsel's opinion. We do not agree with the defendant's contention that this fact is immaterial simply because the bonds were eventually all picked up. In addition, the bank acted contrary to the written trust agreement in failing to

demand payment for accrued interest on the bonds. The bank also permitted the bonds to be picked on a piecemeal basis at a fifteen percent discount. F & M knew the issuer's attorney objected to these practices. Menghini had written the bank protesting the discount, the method of delivery and the waiver of accrued interest. In addition he stated, "we must use extreme caution on behalf of the bondholders to see that the money is expended and the tenant in its enterprises is successful and able to meet the terms of the lease. . . ." Although the bank contends the piecemeal delivery and discount were approved by bond counsel, it must be determined whether reliance on the bond counsel was justified. For instance, if the bank had knowledge of the scheme and was acting in concert with its co-defendant Rausch to further the fraud, reliance on bond counsel's opinion would be a meritless defense. Even the post-sale conduct of the bank in paying unitemized bills approved by the plant manager could be found to be part of a scheme to further raid the bond proceeds. There is evidence that the plant manager wrongfully diverted over $100,000 of the bond proceeds held by F & M by authorizing payments to a dummy corporation he controlled. Plaintiffs contend this feat was made possible by the bank's failure to question the bills that were submitted. F & M's fiduciary duties as a trustee to carefully manage the proceeds of the bond sales are an important consideration in this dispute. We cannot say that a jury would be unable to find such conduct to be part of an overall Rule 10b–5 scheme to defraud the purchasers.

In summary, sufficient facts are in dispute to preclude summary judgment and to permit plaintiffs to proceed to trial.

■ 2. *City of Pittsburg's Motions to Dismiss and for Summary Judgment on the Rule 10b–5 Claims.* In researching these motions we found a very recent opinion by Judge Richard Owen of the Southern District of New York that addresses pertinent issues. *In re New York City Municipal Securities Litigation,* [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,258 (S.D.N.Y. Jan. 25, 1980). Judge Owen held that municipalities fall

without the scope of persons who can be liable under the 1934 Act antifraud provisions for events occurring prior to the 1975 Amendments. We invited the parties to the present action to address these issues. Plaintiffs, the intervenor Fiesler, the City of Pittsburg, and Menghini have done so.

In the *New York City* litigation Judge Owen placed primary reliance on the omission of municipalities from the definition of "person" in the 1934 Act. Judge Owen stated as follows:

> Section 10(b), and Rule 10b–5 promulgated thereunder, make it unlawful for "any person" to engage in fraud in the sale or purchase of "any security." At the time of the events in suit, and prior to its amendment on June 4, 1975, § 3(a)(9) of the 1934 Act defined "person" as follows:
>
>> The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a business trust, or an unincorporated organization. 1934 Act, ch. 404, § 3(a)(9), 48 Stat. 882.

This definition of "person" does not by its terms, apply to municipalities, states or the federal government. Nor can such entities be included by implication. This is clear from a comparison of § 3(a)(9) of the 1934 Act with § 2(2) of the 1933 Act, 15 U.S.C. § 77b(2), in which Congress expressly included governmental entities:

> The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a trust, any unincorporated organization, *or a government or political subdivision thereof.* (Emphasis added.)

Moreover, in June of 1975, Congress found it necessary to amend § 3(a)(9) to expressly include a "government, or political subdivision, agency, or instrumentality of a government." Pub.L. 94–29, § 3, 89 Stat. 97 (1975), 15 U.S.C. § 78c(a)(9) (1977 Supp.) Thus, the omission of express reference to these entities in § 3(a)(9) of the 1934 Act reflects a decision *not* to include governments within that section.

The New York court then examined the legislative history and found congressional intent that governmental entities were not to be regulated by the 1934 Act.

Congressional reluctance to subject governmental issuers to the civil liability provisions of the securities laws is clearly expressed in the House Report accompanying the 1933 Act. There, the House Committee, explaining the reasons for the § 3(a)(2) exemption for governmental issuers, stated:

> Paragraph (2) exempts United States, Territorial and State obligations, or obligations of any political subdivision of these governmental units. The term "political subdivision" carries with it the exemption of such securities as county, town, or municipal obligations, as well as school district, drainage district, . . . The line drawn by the expression "political subdivision" corresponds generally with the line drawn by the courts as to what obligations of States their units and instrumentalities created by them, are exempted from Federal taxation. *By such a delineation, any constitutional difficulties that might arise with reference to the inclusion of state and municipal obligations are avoided.* H.R.Rep.No.85, 73rd Cong., 1st Sess. 14 (accompanying H.R. 5480) (emphasis added).

These same constitutional limitations, real or imagined, upon Congress' authority to subject governmental issuers to the regulatory scheme were an obvious factor leading to the exemption of such issuers from § 5 and § 12(2) of the 1933 Act. One year later, after further hearings on the constitutional political and economic impact of regulations affecting governmental issuers, Congress continued to be of the same view and exempted transactions in government obligations from certain provisions of the 1934 Act. The definition of "person" in the 1934 Act, operating as it does to remove governmental instrumentalities from the civil liability provisions of § 10(b), simply furthers the Congressional policy announced in the 1933 Act.

Judge Owen found further support for the favored treatment that municipalities would enjoy if excluded from the coverage of the 1934 Act in the regulatory scheme for the municipal securities market established by the 1975 amendments.

Concern that "even if regulation were limited to dealers, it would inevitably have consequences for issuers," prompted the adoption of the Tower Amendments. These amendments attempted to limit the "collateral effect" of the 1975 Amendments on issuers in the following way:

> (d)(1) Neither the Commission nor the Board is authorized under this chapter, by rule or regulation, to require any issuer of municipal securities, directly or indirectly through a purchaser or prospective purchaser of securities from the issuer, to file with the Commission or the Board prior to the sale of such securities by the issuer any application, report, or document in connection with the issuance, sale, or distribution of such securities.
>
> (2) The Board is not authorized under this chapter to require any issuer of municipal securities, directly or indirectly through a municipal securities broker or municipal securities dealer or otherwise, to furnish to the Board or to a purchaser or a prospective purchaser of such securities any application, report, document, or information with respect to such issuer . . . . .

15 U.S.C. § 780–4(d). The aim of the Tower Amendments was to insure that the 1934 Act (as amended) would not "tamper in any way with prerogatives of state and local governments in their sale of securities." 121 Cong.Rec. 6188 (1975) (Remarks of Senator Williams). Thus, in 1975 Congress merely ratified the approach taken in 1934 with respect to municipal securities. It chose, again, for possibly "obvious political reasons," to exempt municipalities themselves from regulation while subjecting others in the municipal securities market to the Act's regulatory scheme.

The limited case law that has addressed this issue also supports the view that cities fall without the scope of the 1934 Act. The court, in *Greenspan v. Crosbie*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,780 (S.D.N.Y.1976), dismissed a Section 10(b) action by the sellers and purchasers of the stock of a Canadian company against the province of Newfoundland. Because it was a governmental entity, the court found the province was not a "person" within the meaning of Section 3(a)(9). The court compared the 1934 Act definition with the 1933 Act definition and found the language of Section 3(a)(9) "clear and unambiguous" in not covering governments.

Section 3(a)(9) was similarly construed in *In re Equity Funding Corp. of America Securities Litigation*, 416 F.Supp. 161, 198 (C.D.Cal.1976). Therein the omission of language covering governments from the definition of person in the 1934 Act was one basis for the court dismissing the Section 10(b) claims against California, Illinois and state administrative officers and agencies.

Plaintiffs in the action before us are highly critical of the reasoning and conclusion of Judge Owen. Primarily they attack his interpretation of the legislative history of the 1975 Amendments and the record of congressional proceedings on proposed amendments in 1976. In addition to establishing a regulatory scheme for the municipal securities market, the 1975 amendments expressly added "government, or political subdivision, agency, or instrumentality of a government" to the definition of "person." Plaintiffs contend that this was merely a clarifying amendment. In an exhaustive memorandum on the subject, plaintiffs cite numerous examples in the history of the 1975 Amendments to support their contention that Congress, municipalities themselves, and persons involved in the municipal securities market believed that cities were subject to the antifraud provisions of the 1934 Act.

If the legislative history of the 1975 Amendments was the only ground upon which to base our decision, plaintiffs' position would be more persuasive. However, for the same reason that plaintiffs attack Judge Owen's reliance upon statements made in Congress one year subsequent to the adoption of the 1975 Amendments, we can give little credence to the comments made in Congress concerning the scope of the 1934 Act some forty years after that Act was adopted. The plain language of the statute and the more immediate legislative history of the 1933 and 1934 Acts are far more persuasive.

For the reasons stated above we find that the City of Pittsburg cannot be held liable under Section 10(b) of the 1934 Act. Accordingly, we need not reach the City's proffered defenses of the Kansas notice of claim statute, failure to plead a condition precedent, immunity and the Tenth Amendment, so far as the Section 10(b) claim is concerned.

■ *3. Rausch and Menghini's Motions to Dismiss and for Summary Judgment on the Rule 10b–5 Claim.* Rausch moves to dismiss the plaintiffs' Rule 10b–5 claim for the reason that Section 12(2) of the 1933 Act provides the exclusive remedy. A similar contention objecting to a plaintiff's Section 10(b) claim was answered by the court in *Brunner v. Bush and Company, Inc.*, No. 75–88–C6 (D.Kan., *unpublished*, May 27, 1977) as follows:

> While language in *Gilbert v. Nixon*, 429 F.2d 348 (10th Cir. 1970), indicated that any conflict between § 12(2) and § 10(b) would be construed in favor of the former, the Tenth Circuit Court of Appeals in that case did not preclude the plaintiff from pursuing both causes if there existed a difference in the scope of the right or remedy between the two sections. The Tenth Circuit Court of Appeals later gave tacit approval to asserting joint claims under both § 12(2) and § 10(b) in *Clegg v. Conk*, 507 F.2d 1351 (10th Cir. 1974). In addition, one can argue that there is no conflict between a joint claim under § 12(2) and § 10(b). The former permits liability to be imposed upon a showing of negligence but is balanced with procedural requirements such as an express statute of limitations. The latter does not contain such procedural requirements but liability is imposed only upon a higher

degree of culpability, that is, scienter. See *In re Clinton Oil Company Securities Litigation,* CCH Fed.Sec.L.Rep. ¶ 96,015, 91,575 (D.Kan., March 18, 1977). The Court declines to preclude plaintiffs from proceeding in this action under § 10(b) of the 1934 Act even though plaintiffs also assert claims under § 12(2) of the 1933 Act.

Accordingly, plaintiffs' Section 12(2) claim does not preclude the Rule 10b–5 claim.

■ Rausch and Menghini also urge dismissal of plaintiffs' Rule 10b–5 claim for the reason that mere reckless conduct is not actionable. Defendants rely on *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Although the Supreme Court clearly held that negligence was insufficient to state a cause of action under Rule 10b–5, the Court expressly left open the question as to whether recklessness meets the requirement of scienter. Judge Rogers of this district addressed this issue in *In re Clinton Oil Company Securities Litigation,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,015 at p. 91,565. Relying on *Utah State University of Agriculture and Applied Science v. Bear, Stearns & Co.,* 549 F.2d 164 (10th Cir. 1977), Judge Rogers held that defendant's recklessness in making false statements or omitting material facts would be sufficient to establish scienter. In *Seiffer, supra,* we held that recklessness in the context of accountant's liability, as explained in *McLean v. Alexander,* 599 F.2d 1190, 1197–98 (3rd Cir. 1979), would satisfy the scienter requirement of *Ernst & Ernst.* As we previously stated in our discussion of F & M Bank's motion for summary judgment, recklessness may give rise to a finding of scienter as to defendants who had some direct duty to the bond purchasers. However, the standard may be higher for those defendants against whom the plaintiffs seek recovery on secondary liability theories. We will need to examine the facts as they concern each individual defendant, with particular emphasis on each defendant's position or role in the alleged fraud, and the duty each defendant has or does not have to the purchasers. We cannot say as a matter of law that the plaintiffs could

not prevail upon a showing of recklessness on the part of Rausch.

■ Likewise, we cannot agree with Menghini's contention that summary judgment should be entered in his favor because he never made *any* representations to bond purchasers, let alone misrepresentations or representations containing omissions. In response to Menghini's contentions, plaintiffs stress that Menghini owed a fiduciary duty to the buyers in his role as attorney for the issuer. *See Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 464 F.Supp. 528 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,834 (D.Md.1978); *Felts v. NASA,* 446 F.Supp. 357 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,860 (N.D.Miss.1978). The exact nature and scope of the fiduciary duty alleged is not clear from the allegations or from the cases upon which plaintiffs rely. Furthermore, it is unclear what effect the presence of bond counsel had on this alleged duty. We also note that Menghini's "Summary of Supplemental Undisputed Facts" does not cite supporting evidence in the record. Indeed, the plaintiffs dispute the alleged "facts." We cannot conclude that the controverted facts are immaterial. Such a determination, if appropriate, must await a full trial.

In addition, Menghini asks the court to hold that plaintiffs have not satisfied the prerequisites for liability on a theory of aiding and abetting. As mentioned above, the disputed facts preclude summary judgment. However, we refer counsel to the court's statements on aiding and abetting in our discussion of the F & M Bank's motion for summary judgment on the Rule 10b–5 claim.

Last, Menghini asserts that if the City is outside the scope of the 1934 Act, then as city attorney he likewise may not be found liable. See our discussion of the City's liability under the 1934 Act, supra, at 11–15. At the least, a question of fact remains as to whether Menghini was properly acting within the scope of his duties as city attorney. This issue precludes dismissal of the claim.

4. *Motions to Dismiss the Rule 10b–5 Claim by Defendants McQueen and Computer Consultants, Inc.* Defendants McQueen and Computer Consultants, Inc. move to dismiss the rule 10b–5 claim because it is barred by the applicable two-year statute of limitations at Kansas Statutes Annotated § 60–513. While we must apply the most appropriate state statute of limitations in the absence of an express federal limitation, federal law establishes the date on which the statute begins to run. *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). The starting point for the running of the period will be a question of fact to be determined at trial. The defendants have completely failed to meet their burden of establishing that no material facts continue in dispute on the 1934 Act statute of limitations issue. No suggestions directly supporting defendants' contention are even offered. From the suggestions in support of a contention that the 1933 Act Section 13 statute of limitations bars plaintiffs' 1933 Act Section 12(2) claim, it is apparent that these defendants were made parties to the action on August 11, 1975. Even if we were to use December 6, 1973, the date the bonds were initially issued, to start the running of the period, the two-year statute would not bar this cause of action. At first glance, the December 6, 1973 date would seem to be the earliest possible date on which to begin the period. Dismissal on this ground will not be ordered.

b. *Section 17(a) of the 1933 Act.*

In other cases before us, we have found little practical advantage in determining whether an implied cause of action exists under Section 17(a) of the 1933 Act because of the substantial overlap with Rule 10b–5 claims. *Seiffer, supra,* at 662; *Brooks v. Kansas Savings & Loan Association,* No. 77–2262 (D.Kan., *unpublished,* May 19, 1978); *Tucker v. Schwindt,* [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,402. *See also Schaefer v. First National Bank of Lincolnwood,* 509 F.2d 1287, 1293 (7th Cir. 1975); *Unicorn Field, Inc. v. Cannon Group, Inc.,* 60 F.R.D. 217, 224 (S.D.N.Y.1973); 3 Loss, *Securities Regulation* 1427

(1961) and 6 Loss, *Securities Regulation* 3528 (1969). However, the dismissal of the Section 10(b) claims as to the City requires us to further consider whether plaintiffs have a private cause of action under Section 17(a) of the 1933 Act. 15 U.S.C. § 77q(a).

Judge Gignoux has held that where a plaintiff attempted to bring an action under both Section 12(2) and Section 17(a) of the 1933 Act, the express remedy of Section 12(2) precludes the maintenance of an implied cause of action under Section 17(a). *Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890 (D.Me.1971). To the extent that the alleged wrongful conduct is covered by both Section 12(2) and Section 17(a), we must agree with Judge Gignoux.

A question remains as to any conduct that would fall without Section 12(2), but within Section 17(a). The Supreme Court has refused to determine whether an implied private cause of action exists under Section 17(a). *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The Court has stated:

> We express, of course, no opinion on whether § 17(a) in light of the express civil remedies of the 1933 Act gives rise to an implied cause of action. *Compare Greater Iowa Corp. v. McLendon,* 378 F.2d 783, 788–791 (CA 8 1967), with *Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 787 (CA 2 1951). *See, e. g. SEC v. Texas Gulf Sulfur Co.,* 401 F.2d 833, 867 (CA 2 1968) (Friendly, J., concurring), *cert. denied sub nom. Coates v. SEC,* 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969); 3 L. Loss, *Securities Regulations* 1785 (2d ed. 1961).

*Id.* at 734 n.6, 95 S.Ct. at 1924 n.6.

While the Tenth Circuit has not yet spoken directly to the Section 17(a) issue, other circuits have reached conflicting results. *Kirshner v. United States,* 603 F.2d 234 (2nd Cir. 1978) [private right of action exists under 17(a)]; *Daniel v. Int'l Brotherhood of Teamsters,* 561 F.2d 1223 (7th Cir. 1977), *rev'd on other grounds,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) [private right of action exists under 17(a) for fraudulent misrepresentation]; *Newman v. Prior,*

518 F.2d 97, 99 (4th Cir. 1975) [section 17(a) private damage claim recognized]; *Greater Iowa Corporation v. McLendon*, 378 F.2d 783, 788–790 (8th Cir. 1967) and *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152 (8th Cir. 1977) [no Section 17(a) private remedy]. We note that both Section 10(b) and Section 17(a) claims were recognized in *Kirshner* and *Daniel*. Without discussion, the Fourth Circuit recognized a bare Section 17(a) cause of action in *Newman*. However, the Fourth Circuit relied primarily on *Johns Hopkins University v. Hutton*, 488 F.2d 912 (4th Cir. 1973), wherein both Section 10(b) and Section 17(a) claims were recognized.

We believe little weight should be given to a finding of a private action under Section 17(a) when a remedy is also available under Section 10(b). Judge Friendly stated in *SEC v. Texas Gulf Sulfur, supra*, at 867, as follows:

> Once it had been established, however, that an aggrieved buyer has a private action under § 10(b) of the 1934 Act, there seemed little practical point in denying the existence of such an action under § 17 . . . . To go further than this, as Professor Loss powerfully argues, Securities Regulation at 1785, would totally undermine the carefully framed limitations imposed on the buyer's right to recover granted by § 12(2), of the 1933 Act.

The lack of analysis in cases finding a Section 17(a) private cause of action when a Section 10(b) remedy is also available, indicates that other courts agree with Judge Friendly's view.

The district courts that have wrestled with this problem have also reached varying conclusions. Many cases that have involved Section 10(b) claims have found a private cause of action under Section 17(a) as well. *Felts v. National Account Systems Assoc.*, 469 F.Supp. 54 (N.D.Miss.1978); *DeMarco v. Security Planning Service, Inc.*, 462 F.Supp. 1066 (D.Ariz.1978); *Wachovia Bank & Trust Co., N. A. v. National Student Marketing Corp.*, 461 F.Supp. 999 (D.D.C.1978); *Valles Salgado v. Piedmont Capital Corp.*, 452 F.Supp. 853 (D.Puerto Rico 1978); *Continental Assurance Co. v. American Banks-*hares *Corp.*, 439 F.Supp. 804 (E.D.Wis. 1977); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417 (N.D.Cal.1968), modified on other grounds 430 F.2d 1202 (9th Cir.); *Thiele v. Shields*, 131 F.Supp. 416 (S.D.N.Y. 1955); *Osborne v. Mallory*, 86 F.Supp. 869 (S.D.N.Y.1949). The District of Alaska has found an implied private action under Section 17(a)(3), but not Section 17(a)(1) or (a)(2), in a case that also asserts a Section 10(b) claim. *Demoe v. Dean Witter & Co.*, 476 F.Supp. 275 [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,282 (D.Alaska, Sept. 7, 1979). Others find a private remedy that is limited to some extent by Sections 11 and 12 of the 1933 Act. *In re Gap Stores Securities Litigation*, 457 F.Supp. 1135 (N.D.Cal.1978); *In re Falstaff Brewing Corp. Antitrust Litigation*, 441 F.Supp. 62 (E.D.Mo.1977); *In re Equity Funding Corp. of American Securities Litigation*, 416 F.Supp. 161 (C.D.Cal. 1976); *Wulc v. Gulf & Western Indus., Inc.*, 400 F.Supp. 99 (E.D.Pa.1975); *B & B Investment Club v. Kleinert's Inc.*, 391 F.Supp. 720 (E.D.Pa.1975); *Dorfman v. First Boston Corp.*, 336 F.Supp. 1089 (E.D. Pa.1972). Additional cases have held that there is no implied action under Section 17(a): *In re New York City Municipal Securities Litigation, supra*; *Marbury Management Inc. v. Kohn*, 470 F.Supp. 509 (S.D.N.Y.1979); *Allegaert v. Perot*, 78 F.R.D. 427 (S.D.N.Y.1978); *Lingerfelter v. Title Ins. Co. of Minnesota*, 442 F.Supp. 981 (D.Neb. 1977); *Scarfarotti v. Bache & Co.*, 438 F.Supp. 199 (S.D.N.Y.1977); *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D.Ga.1977); *Person v. New York Post Corp.*, 427 F.Supp. 1297 (E.D.N.Y.1977), *aff'd without opinion* 573 F.2d 1294 (2nd Cir. 1977); *Lincoln National Bank v. Lampe*, 414 F.Supp. 1270 (N.D.Ill.1976); *Architectural League of New York v. Bartos*, 404 F.Supp. 304 (S.D. N.Y.1975); *Welch Foods Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393 (S.D.N.Y. 1974); *Reid v. Mann*, 381 F.Supp. 525 (N.D. Ill.1974); *Ferland v. Orange Groves of Florida, Inc.*, 377 F.Supp. 690 (M.D.Fla.1974); *Cowsar v. Regional Recreations, Inc.*, 65 F.R.D. 394 (M.D.La.1974); *Dyer v. Eastern Trust & Banking Co., supra*; *Emmi v. First-Manufacturer's National Bank of Lewiston and Auburn*, 336 F.Supp. 629 (D.Me.1971).

When Section 10(b) claims are absent form the court's consideration, well reasoned decisions have squarely faced the Section 17(a) issue and found no implied private cause of action. *Gunter, supra; Reid v. Mann, supra; Dyer, supra.* The rationale for finding no implied cause of action in Section 17(a) is set out in the following excerpt from *Gunter, supra,* at 45–47:

In addressing the issue before the Court, the language of § 17 must first be examined, for "[t]he starting point in every case involving construction of a statute is the language itself." *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 197, 96 S.Ct. at 1383. It is readily apparent, and undisputed, that there is no express private right of action in § 17(a). Statutory construction and legislative history also negates the contention that there is an implied right of action in § 17(a). "Viewing the 1933 Act in its entirety, both §§ 11 and 12 contain express provisions for civil remedies, which creates the reasonable inference that the absence of such a remedy in § 17 was not an oversight or the product of inartful draftsmanship." *Reid v. Mann, supra,* 381 F.Supp. at 526.

Proponents of a § 17(a) private cause of action emphasize that the Supreme Court has held that in some circumstances a private cause of action can be implied with respect to the 1934 Act's antifraud provisions, even though the relevant provisions are silent as to remedies. *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (§ 14(a)); *Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n.9, 92 S.Ct. 165 [169], 30 L.Ed.2d 128 (1971) (§ 10(b)).

The reasoning of these decisions is that, "where congressional purposes are likely to be undermined absent private enforcement, private remedies may be implied in favor of the particular class intended to be protected by the statute." *Piper v. Chris-Craft Industries, Inc., supra,* 430 U.S. 1 at 25, 97 S.Ct. 926 at 941 [51 L.Ed.2d 124]; *J. I. Case Co. v. Borak, supra,* 377 U.S. at 432, 84 S.Ct. 1555; *Blue Chip Stamps v. Manor Drug Stores,*

421 U.S. 723, 730, 95 S.Ct. 1917, [1922] 44 L.Ed.2d 539 (1975).

Even against this background, however, the Court does not find that § 17, which is entirely silent as to private remedies, implies a private right of action.

The only provision in either the 1933 or 1934 Act that can be read to impose liability for damages for negligent misrepresentation without restrictions as to the kinds of plaintiffs, due diligence defenses, or a short statute of limitations is § 17(a)(2) of the 1933 Act. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 867 (2d Cir. 1968) (Friendly, J., concurring), *cert. denied sub nom., Coates v. SEC,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968). However, to permit such a cause of action would undermine the carefully framed limitations imposed by Congress in §§ 11 and 12 of the 1933 Act and 10(b) of the 1934 Act, in addition to restrictions imposed by the Supreme Court in recent decisions.

As expressed by Judge Friendly in his concurring opinion in *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 867:

"[T]here is unanimity among the commentators, including some who were in a peculiarly good position to know, that § 17(a)(2) of the 1933 Act—indeed the whole of § 17—was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability, and was never believed to supplement the actions for damages provided by §§ 11 and 12. *See* Landis, *Liability Sections of Securities Act,* 18 Am.Acct. 330, 331 (1933); Douglas and Bates, *Federal Securities Act of 1933,* 43 Yale L.J. 171, 181–82 (1933); 3 Loss, *Securities Regulation* 1785–86 (1961). When the House Committee Report listed the sections that 'define the civil liabilities imposed by the Act' it pointed only to §§ 11 and 12 and stated that '[t]o impose a greater responsibility [than that provided by §§ 11 and 12] . . . would unnecessarily restrain the conscientious administration of honest business with no compensating advantage to the public.'

H.Rep.No.85, 73d Cong., 1st Sess. 9–10 (1933)."

In *Dyer v. Eastern Trust and Banking Co., supra,* cited approvingly in *Emmi v. First-Manufacturers National Bank of Lewiston and Auburn, supra; Hamrick v. Tico, Inc., supra; Welch Foods Inc. v. Goldman Sachs, supra* ; and *Architectural League of New York v. Bantos, supra,* the court, quoting a portion of Professor Loss's treatise, stated as follows:

". . . In November 1933 Commissioner Landis of the Federal Trade Commission, who had played a prominent part in the drafting of the statute, stated in an address:

'The suggestion has been made on occasion that civil liabilities arise also from a violation of Section 17, the first subsection of which makes unlawful the circulation of falsehoods and untruths in connection with the sale of a security in interstate commerce or through the mails. But a reading of this section in the light of the entire Act leaves no doubt but that violations of its provisions give rise only to a liability to be restrained by injunctive action or, if wilfully done, to a liability to be punished criminally.'

"Although this was said many years before the *Kardon* case, there is nothing novel about the doctrine of implied tort liability based on violation of a statute. The question is simply whether there is the same justification. for implying such liability under the 1933 act as there is under the 1934 act. It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e), 16(b) and 18 do not cover all the variegated activities with which that act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act to the detailed remedies specifically created by §§ 11 and 12. The 1933 act is a much narrower statute. It deals only with disclosure and fraud in the sale of securities. It has but two important substantive provisions, §§ 5 and 17(a). Noncompliance with § 5 results in civil liability under § 12(1). Faulty compliance results in liability under § 11. And § 17(a) has its counterpart in § 12(2). It all makes a rather neat pattern. Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b) and 18 of the 1934 act) are all-embracing. This is not to say that the remedies afforded by §§ 11 and 12 are complete. But the very restrictions contained in those sections and the differences between them—for example, the fact that § 11 but not § 12 imposed liability on certain persons connected with the issuer without regard to their participation in the offering and the fact that § 12(2) does not go so far in relation to § 17(a) as § 12(1) goes in relation to § 5—make it seem the less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a). Particularly is this so in view of the fact that § 11, together with the statute of limitations in § 13, was actually tightened in the 1934 amendments to the Securities Act. 3 Loss, *Securities Regulation* 1784–85 (2d ed. 1961)."

■ In 1942, the Securities and Exchange Commission adopted the language of § 17(a) in drafting Rule 10b–5, 17 C.F.R. § 240.10b–5, which was promulgated under the authority of § 10(b) of the 1934 Act, and the courts have implied a private right of action under § 10(b) and Rule 10b–5. Given the almost identical language of Rule 10b–5 and § 17(a) and the fact that Rule 10b–5 is a broader provision than § 17(a) in that it covers both purchases and sales of securities, some courts see no practical point in denying the existence of such a private right of action under § 17. However, the practical significance of denying a private right of action under § 17 is that plaintiffs will be unable to circumvent the express civil remedies of both the 1933 and 1934 Acts. Such a rationale is sufficient to satisfy the Court that a private right of action should not be allowed under § 17(a).

1288

Depriving plaintiffs of a cause of action under § 17(a) does not result in rendering the requirements of § 17(a) unenforceable. A plaintiff may seek injunctive relief under § 17(a) and, when violation of § 17(a) is wilful, criminal prosecution may ensue. Furthermore, an aggrieved purchaser has a private action under §§ 11 and 12 of the 1933 Act and § 10(b) of the 1934 Act subject to certain congressional and judicial limitations. If these provisions do not supply such a purchaser with a cause of action it is because Congress or the Supreme Court did not intend the purchaser to have a cause of action. Such a purchaser should not be allowed to do by implication under § 17 what he is expressly not permitted to do by the terms of the above-mentioned provisions which provide civil matters.

The language of § 17 gives no indication that Congress intended to create a private cause of action for violation of § 17. Nor has the Court been cited to any evidence in the legislative history that would support a departure from the language of the 1933 Act. Furthermore, an implied private cause of action under § 17(a) is unnecessary to ensure the fulfillment of Congress's purpose in adopting the federal securities laws and, therefore, is unnecessary. *See Piper v. Chris-Craft Industries, Inc., supra*, 430 U.S. at 42, 97 S.Ct. 926 [at 949]; *Santa Fe Industries, Inc. v. Green, supra*, 430 U.S. at 472, 97 S.Ct. 1292 [at 1300].

We find this rationale consistent with recent Supreme Court cases concerning implied rights of action. *TransAmerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche, Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

We adopt the reasoning of *Gunter, Reid* and *Dyer* and find no implied cause of action under Section 17(a). Plaintiffs will not be permitted to circumvent the restrictions of the 1934 Act and the express remedy of Section 12(2) of the 1933 Act via an implied Section 17(a) action. Although the necessity for deciding the issue was the result of the dismissal of the Section 10(b) claim as to the city, our finding that there is no Section 17(a) private cause of action applies to all defendants. To the extent that this litigation is based upon Section 17(a), the claim is dismissed.

C. *Section 12(2) of the Securities Act of 1933.*

■ 1. *The Section 13 Statute of Limitations.* Defendants Rausch, F & M Bank, McQueen, Computer Consultants, Inc. and the City of Pittsburg contend that Count II is barred by the statute of limitations found at Section 13 of the 1933 Act, 15 U.S.C. § 77m. Count II is a fraud claim based upon Section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2). Section 12(2) reads as follows:

Any person who—. . .

(2) offers or sells a security (whether or not exempted by the provisions of section 3, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Section 13 reads in pertinent part as follows:

No action shall be maintained to enforce any liability created under . . . section 12(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . In no event shall any such action be brought to enforce a liability created . . . under section 12(2) more than three years after the sale.

The sale of the Pittsburg bonds began on December 3, 1973, and this action was filed on March 25, 1975. As to the original defendants, the three-year limitation of Section 13 does not bar the action.

The defendants first contend that dismissal is appropriate because of the plaintiffs' failure to affirmatively plead facts showing that they are within the one-year limitation of the statute. We have previously held that plaintiffs must affirmatively plead such facts in Section 12 cases. *Kenton v. Lopata*, No. 76–20–C2 (D.Kan., *unpublished*, August 31, 1979). *See also McMerty v. Burtness*, 72 F.R.D. 450, 453 (D.Minn.1976). In the present case the Third Amended Complaint alleges that plaintiffs were unaware of the omissions alleged and could not have reasonably known of the omissions until on or about October 1, 1974. Plaintiffs have thus affirmatively pleaded compliance with the Section 13 statute of limitations as to defendants named in the original complaint.

Both F & M Bank and Rausch were named in the March 25, 1975 complaint. Neither of these defendants has placed evidence before the court contradicting plaintiffs' allegations of compliance with the one-year limitation. The limitation cannot be found to bar plaintiffs' claim against the bank and bond counsel at this time.

The City of Pittsburg also raises the Section 13 limitation issue. This defendant was not named in the original complaint. The City was joined as a party-defendant in the Second Amended Complaint that was filed on October 18, 1976. The City contends that plaintiffs must have known of the City's involvement in these transactions prior to October 1, 1974. Plaintiffs respond that they deposed Menghini, Rausch, Stricklan and Rogers in July and August of 1976. On September 15, 1976, plaintiffs moved for leave to file a second amended complaint adding the City as an additional defendant, based upon newly discovered evidence. Presumably, the evidence was discovered at, or as a result of the July and August depositions. On October 18, 1976, the court granted leave and the amendment was filed. When it became apparent that plaintiffs were relying on theories of liability beyond those stated in the Second Amended Complaint, defendants sought and obtained an order of the court requiring a third amended complaint. This complaint is the current one filed on March 9, 1978. The Third Amended Complaint asserts a Section 12(2) claim against the City and others.

■ To resolve this issue of the barring effect of Section 13 we must determine whether the Section 12(2) claim relates back to the October 18, 1976 complaint, and then whether the 1976 complaint falls within the one-year period of limitation. Rule 15(c) provides that an amendment relates back to the date of the original pleading "[w]henever the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Since a Rule 10b–5 securities fraud claim is asserted against the City in the 1976 complaint, relation back on the Section 12(2) securities fraud claim seems appropriate. The 1976 complaint would then fall within the one-year period of Section 13 if plaintiffs in fact discovered evidence of liability on the part of the City at the time of the July and August depositions, and additionally, plaintiffs should not have discovered such omissions or untrue statements by the exercise of reasonable diligence prior to one year before the October 1976 complaint. We find no merit to plaintiffs' alternative assertion that the October 1976 amendment adding the City as a party should itself relate back to the original complaint. *See In re Clinton Oil Company Securities Litigation, supra.*

The above-stated factual allegations concerning the plaintiffs' compliance with Section 13 are found in plaintiffs' suggestions opposing defendants' motions. Such compliance must be affirmatively pleaded in the complaint. *Kenton, supra; McMerty, supra.* As to the City, plaintiffs have failed to meet the requirements of pleading a Section 12(2) claim. The procedure applied in *Kenton* will be adopted here; Count II is dismissed as to the City without prejudice to the plaintiffs' right to file a proper amended complaint within twenty days. If plaintiffs do not amend, the dismissal will be made with prejudice.

■ Since we have the benefit of plaintiffs' suggestions on the matter of the Section 13 limitations periods, we feel it would be efficient to address the issue as it would stand if plaintiffs amend their complaint to set out the facts alleged in the suggestions. In short, the effect of Section 13 in barring the Section 12(2) claim against the City must be determined at trial. As we stated in *Seiffer v. Topsy's Int'l, Inc.*, 64 F.R.D. 714 (D.Kan.1974): "[T]he federal tolling doctrine applies in the determination of when plaintiffs, in the exercise of due diligence should have discovered the alleged fraud. *Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968); *deHaas v. Empire Petroleum Company*, 435 F.2d 1223 (10th Cir. 1970). It requires no restatement of the alleged facts of this case and of the relationship of the parties for this court to determine that this is an issue for the trier of fact. Seldom is it possible for such an issue to be determined summarily. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168 (10th Cir. 1974)."

The Section 13 bar is also a contention of defendants McQueen and Computer Consultants. These defendants were not joined as parties until the First Amended Complaint was filed on August 11, 1975. The First Amended Complaint alleged violations of Section 12(2). The Third Amended Complaint alleged that plaintiffs did not know and could not reasonably have known of the omissions until October 1, 1974. Plaintiffs have thus affirmatively pleaded compliance with Section 13 as to these defendants.

As with the other defendants, the statute of limitations issue raised by McQueen and Computer Consultants is ultimately one to be decided at trial. Plaintiffs contend that they simply could not have been expected to know of omissions made in the offers and sales of the bonds until the Fall of 1974 when the SEC brought injunctive proceedings against some of the defendants in Florida, and when scheduled interest payments on the bonds were missed. Plaintiffs could prove these facts and show compliance with the requirement of Section 13. Dismissal is inappropriate.

■ *2. The 1933 Act Securities Exemption for Tax Exempt Bonds.* The defendants contend that the Pittsburg industrial development bonds fall within the exception stated parenthetically in Section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2). This antifraud provision applies to any person who offers or sells a security "whether or not exempted by the provisions of section 3, *other than paragraph (2) of subsection (a) thereof.* . . ." (emphasis added.) Section 3(a)(2) defines exempted securities in pertinent part as follows:

(a) Except as hereinafter expressly provided, the provisions of this title shall not apply to any of the following classes of securities: . . . any security which is an industrial development bond (as defined in section 103(c)(2) of the Internal Revenue Code of 1954 . . . if, by reason of the application of paragraph (4) or (6) of section 103(c) of such Code (determined as if paragraphs (4)(A), (5), and (7) were not included in such section 103(c)), paragraph (1) of such section 103(c) does not apply to such security

. . . . .

Section 103 of Title 26 of the U.S.Code deals with taxation of interest on certain governmental obligations. Subsection (a)(1) states the general rule that gross income does not include interest on the obligation of a political subdivision of a State. Subsection (c) creates a general exception for industrial development bonds that fail to meet certain conditions of purpose or amount. Industrial development bonds are defined in (c)(2) as any obligation—

(A) which is issued as part of an issue all or a major portion of the proceeds of which are to be used directly or indirectly in any trade or business carried on by any person who is not an exempt person (within the meaning of paragraph (3)), and

(B) the payment of the principal or interest on which (under the terms of such obligation or any underlying arrangement) is, in whole or in major part—

(i) secured by any interest in property used or to be used in a trade or business or in payments in respect of such property, or

(ii) to be derived from payments in respect of property, or borrowed money, used or to be used in a trade or business.

An exempt person is defined at (c)(3) as

(A) a governmental unit, or

(B) an organization described in section 501(c)(3) and exempt from tax under section 501(a) (but only with respect to a trade or business carried on by such organization which is not an unrelated trade or business, determined by applying section 513(a) to such organization).

Certain small issues of industrial development bonds are excepted at (c)(6) from the effect of the rule of taxation for industrial development bonds. Subsection (c)(6) reads in pertinent part:

(A) In general. Paragraph (1) shall not apply to any obligation issued as part of an issue the aggregate authorized face amount of which is $1,000,000 or less and substantially all of the proceeds of which are to be used (i) for the acquisition, construction, reconstruction, or improvement of land or property of a character subject to the allowance for depreciation, or (ii) to redeem part or all of a prior issue which was issued for purposes described in clause (i) or this clause.

Without this exception, paragraph (c)(1) would operate to remove the § (a)(1) tax exemption.

In the case before us, industrial development bonds were issued for the benefit of Homes and Structures, Inc., a non-exempt person. All or a major portion of the proceeds were to be used for Homes and Structures. The payment of the principal and interest was to be derived in major part from the payments in respect to property and borrowed money used in Homes and Structures' trade or business. The $900,000.00 issue met the dollar limitation on the small issue exemption of (c)(6)(A).

One ground raised by plaintiffs to defeat the tax exemption (and consequently the securities exemption) is whether the small issue exemption requirement concerning the use of the proceeds was met. This requirement reads as follows: "substantially all of the proceeds of [the issue] are to be used (i) for the acquisition, construction, reconstruction, or improvement of land or property of a character subject to the allowance for depreciation. . . ." At the time of the Pittsburg issue, "substantially all" was not defined in the regulations covering the small issue exemption. In 1977 the regulations were amended to include the definition found in the regulations for exempt facilities. The IRS regulations for the small issue exemption now state in pertinent part:

Substantially all of the proceeds of such issue is to be used for the acquisition, construction, reconstruction, or improvement of land or property of a character subject to the allowance for depreciation under section 167. Proceeds which are loaned to a borrower for use as working capital or to finance inventory are not used in the manner described in the preceding sentence. Whether substantially all of the proceeds of an issue of governmental obligations are used in such manner is determined consistently with the rules for exempt facilities in § 1.103–8(a)(1)(i). 29 CFR § 1.103–10(b)(1)(ii) (1979).

The rules for exempt facilities state: "Substantially all of the proceeds of an issue of governmental obligations are used to provide an exempt facility if 90% or more of such proceeds are so used." 29 CFR § 1.103–8(a)(1)(i) (1979).

Plaintiffs rely on the above stated regulations in support of their contentions that

substantially all means "90% or more" and that the Pittsburg issue is not tax exempt and consequently falls without this exception to the Section 12(2) securities fraud statute. Also offered in support are letters from the Internal Revenue Commission. One of the letters was used by the SEC in *SEC v. Astro Products of Kansas, Inc.*, No. 76–359–C6 (D.Kan.) (J. Theis) to support a motion for summary judgment. Plaintiffs state the theory of that case is that the industrial development bond issue was not exempt from taxation or from the Section 12(2) securities antifraud provision because the funds were diverted to the promoters. The other IRC letter offered is found in *Baron v. Commercial & Industrial Bank of Memphis*, [1979 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,826 at n.14, (S.D.N.Y.1979). It states: "Thus, an industrial development bond, which otherwise qualifies, will be tax exempt if at least 90% of the bond proceeds is allocable to the bona fide and reasonable costs of acquisition, construction, reconstruction, or improvement of land or depreciable property (qualifying costs), and no more than 10% of the bond proceeds is allocable to other costs (nonqualifying costs)."

The defendants assert that (1) "substantially all" was not specifically defined as 90% in the applicable regulations at the time of the issue; (2) the test applies to the proposed use of the proceeds, not the actual use; and (3) the standard applies to the use of net proceeds (after selling expenses, attorney's fees, and similar costs are deducted).

Plaintiffs contend the facts of this case show that the underwriters received a $135,000.00 fee (15% of the total issue), that an $18,000.00 fee was paid to All Enterprises, that bond counsel fees of some $15,-000.00 were paid to Rausch, and that a sum in excess of $100,000.00 was diverted to the promoters Bost and Murry. The depositions and exhibits support these contentions.

Defendants have failed to show that no material facts remain in dispute concerning their contention that substantially all of the proceeds from the Pittsburg bond issue were "used for the acquisition, construction, reconstruction, or improvement of land or property of a character subject to the allowance for depreciation under section 167." To the contrary, the plaintiffs have supplied solid support for their assertion that substantially all means 90% or more. Although Section 103 speaks in prospective terms— "substantially all of the proceeds *are to be used*" (emphasis added)—we tend to agree with plaintiffs that the actual distribution of the proceeds will control. The "are to be" language is understandable since the initial determination on the taxation of the interest from the bonds must be made prior to issuance. We also agree that the underwriter's discount or fee should not be excluded from the proceeds before applying the 90% test. We have found some indication that the underwriter's fee normally falls within the range of ¼–5% in municipal bond issues. *In re Blumenfeld*, [1980] Fed. Sec.L.Rep. (CCH) ¶ 82,396 (SEC Division of Enforcement, Dec. 19, 1979). Even if we were to exclude such an expense for applying the test, the diversion of more than $100,000.00 to the promoters would destroy the exemption for the Pittsburg bonds. We will need to determine at trial whether "substantially all" of the proceeds were used for the purposes set out in Section 103. To make such a determination a more detailed accounting of the bond proceeds will be required.

 3. *The Effect of a Guarantee on Municipal Bonds.* The plaintiffs also maintain that the Pittsburg bonds were not exempt for purposes of the Section 12(2) antifraud statute because the bonds were issued with attached guarantees. Plaintiffs' theory is that the guarantee is either a separate security that must be registered and is subject to Section 12(2) or that the combination of the bond and the guarantee is a non-exempt security. Under the latter theory, the non-exempt guarantee is purported to taint the otherwise exempt industrial development bond.

In support the parties offer revenue rulings and SEC no-action letters.

The situation can be summarized as follows. A municipality desiring to issue in-

dustrial development bonds looks to the 1933 Act and finds that they are exempt from that securities act if they are tax exempt under Section 103 of the Internal Revenue Code. The municipality then examines Section 103 and finds that the general rule includes interest from industrial development bonds in gross income but that many exceptions exist. Finding that its project falls within one of the exceptions, the issuer proceeds with its plans. At this point a guarantee of the principal and interest is added to the bonds. Cognizant that the securities exemption is tied to the tax exemption, the municipality determines that such guarantees do not affect the tax exempt status of the bonds. Revenue Ruling 72–575 and 72–134, IRB 1972–13,13. Accordingly, the municipality continues to believe the bonds are exempt from the securities act.

Unfortunately for the municipality the SEC has apparently taken a somewhat different view of the guarantee. In an April 11, 1974 letter offered by plaintiffs concerning industrial development bonds issued by the County of Muskingum, Ohio, the presence of a guarantee by a non-user of the facility to be built with bond proceeds was the basis for the SEC's refusal to issue a no-action letter. The SEC Deputy Chief Counsel wrote, "[W]e are unable to concur in your opinion that the bonds may be issued without registration under the Securities Act of 1933 . . . pursuant to the exemptions provided by Section 3(a)(2) . . . ." *See also* "The Industrial Development Board of the City of Huntsville, Alabama," Securities Regulation and Law Report (BNA), No. 272 C–2 (Oct. 9, 1974). The Commission took a different approach in a more recent letter, *County of Yellowstone*, Fed.Sec.L.Rep. (CCH) ¶ 80,719 (July 15, 1976) [1976–77 Transfer Binder]. *Yellowstone* involved an exempt industrial development bond issue with a non-user guarantee. The SEC stated that it would not recommend action on the bond issue alone. The Commission further stated,

> However, on the basis of the above facts and particularly because the Guarantees are to be made by non-users of the facilities constructed and equipped with the

proceeds from the Bonds (the Association's members), it is our view that the Guarantees may be deemed to be separate securities within the meaning of Section 2(1) of the Act and should not be issued without compliance with the registration requirements of the Act.

Two guarantees were involved in the Pittsburg bond issue. The first was a guarantee by the promoter Bost that the bonds would be picked up and sold by the underwriters. Bost was President of Homes and Structures, the user of the manufacturing plant that was built with the bond proceeds. The second guarantee was by the Windsor Insurance Company. Windsor was purportedly insuring the principal and interest on the bonds. The bonds were sold with Windsor insurance certificates attached. It is the Windsor guarantee that plaintiffs contend was a non-user guarantee and thus was not exempt from the provisions of the 1933 Act. The guarantees were not and could not have been purchased separately in the case of the Pittsburg bonds. No separate charge was made to the bond purchasers for the guarantees.

We agree that the presence of the guarantee "cannot have the effect of denying coverage [of the 1933 Act] to an instrument that otherwise satisfies the Act's definition of a security." *Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970). Similarly, we do not believe the guarantee in these circumstances has the effect of destroying an exemption created by the 1933 Act. Just as the language of the defining statute ties the guarantee to instruments or interests that are otherwise defined as securities, we believe the guarantees in the case now before us are tied to the Pittsburg bonds. The presence of the guarantees does not alter the effect of the 1933 Act upon those bonds. Only if the guarantees changed the tax exempt nature of the bonds, would their presence affect the bonds exempt status under the 1933 Act.

A question remains as to whether the purported guarantees should be separately treated as securities subject to the registration and antifraud requirements. The

Tenth Circuit has held the question of what constitutes a security to be one of law, not fact, in a civil action. *Ahrens v. American-Canadian Beaver Co.*, 428 F.2d 926 (10th Cir. 1970). As a general proposition we agree that a guarantee can be a security. The statutory definition of "security" at Section 2(1) of the 1933 Act states a laundry list of items constituting securities and then specifically includes "any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase" any of the items listed. In the case before us we find no good reason to treat the guarantees as distinct securities. The SEC's failure to issue no-action letters or non-user guarantees of exempt industrial development bond issues is not persuasive. No rationale for the refusal is given by the SEC. The Windsor guarantee was not sold separately from the bonds and we find no statutory requirement or public policy reason for treating it differently than the exempt bond issue. No cases have addressed the issue. In the particular circumstances of this case, the guarantees are not separately subject to the registration and anti-fraud provisions of the 1933 Act.

■ Menghini further contends that insurance policies—such as the Windsor guarantee—are excluded from registration by Section 3(a)(8) of the 1933 Act. 15 U.S.C. § 77c(a)(8). Plaintiffs stress that the subsection excludes insurance policies subject to the supervision of officers of any state or territory of the United States or the District of Columbia. The Windsor Insurance Company was purportedly based in Kingston, Jamaica and appears to exist as only a sham corporation. It is not subject to state regulation. Thus the exclusion is inapplicable on its face.

■ *4. Privity and Section 12(2).* Section 12(2) of the 1933 Act imposes liability upon—

Any person who—. . .
(2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make

the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) . . . . .
15 U.S.C. § 77*l*(2).

Well reasoned cases now hold that Section 12 liability is not strictly limited to the direct seller of the security. *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973); *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971); *Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir. 1969); *Hogland v. Covington County Bank*, Fed.Sec.L.Rep. (CCH) ¶ 94,910 (M.D.Ala. 1977); *Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283 (W.D.N.Y.1971); *Plunkett v. Francisco*, 430 F.Supp. 235 (N.D.Ga.1977); *Stern v. American Bankshares Corp.*, 429 F.Supp. 818 (D.Wis.1977); *In re Home-Stake Production Co. Securities Litigation*, 76 F.R.D. 337 (N.D.Okl.1975); *In re Caesar's Palace Securities Litigation*, 360 F.Supp. 366 (S.D.N.Y.1973); *duPont v. Wyly*, 61 F.R.D. 615 (D.Del.1973). The test applied in these decisions requires more than mere participation but less than strict privity; if the acts of the defendant are a proximate cause of the sale of these securities, the defendant meets the seller requirement of Section 12. Such a test encompasses aiders and abettors. The parties have cited no Tenth Circuit or District of Kansas cases on this point. We believe that Section 12(2) liability is not strictly limited to direct sellers.

Rausch has made no factual showing in support of his motion to dismiss for lack of privity. He simply contends that as bond counsel he was not a seller, in control of the sellers or an active participant in the sales of the bonds. A set of facts might exist by which Rausch could be found liable under Section 12(2). We cannot dismiss this claim simply because Rausch was bond counsel. *Cronin, supra.*

F & M Bank has moved for summary judgment on the same ground, lack of privity. The evidence offered in support would demand our granting summary judgment if a strict privity requirement were imposed. The trustee bank has not established that

no material facts remain in dispute. With Section 12 liability expanded to include aiders and abettors we cannot say as a matter of law that liability may not be imposed upon the bank. The same factual disputes apply here that were relevant in our determination that summary judgment for the bank on the Rule 10b–5 claim is inappropriate.

Menghini has also moved for summary judgment because of lack of privity. The suggestions in support do not refer specifically to affidavits, depositions or other documents. Given our expanded view of the Section 12 privity requirement, we cannot enter summary judgment in favor of the issuer's attorney.

5. *Notice of Claim, Pleading Conditions Precedent, Immunity and the Tenth Amendment.* The City of Pittsburg raises several defenses peculiar to its status as a municipality. These include the Kansas Notice of Claim Statute (K.S.A. 12–105), failure to plead a condition precedent, immunity and the Tenth Amendment. In light of our earlier holdings herein, we need not reach these defenses on the Rule 10b–5 and Section 17(a) claims. We shall now address these defenses as they relate to the Section 12(2) claim.

 At the time this action was filed, Kansas Statutes Annotated 12–105 stated:

No action shall be maintained by any person . . . against any city on account of injury to person or property unless the person or corporation injured shall within six (6) months thereafter and prior to the bringing of the suit file with the city clerk a written statement . . .

The statute was repealed in 1979. Pittsburg maintains that the plaintiffs' failure to comply with the statute bars them from bringing this action against the City. Whereas the City urges the court to find that the requirement of the statute is absolute, the plaintiffs maintain that such a statute cannot be permitted to thwart a federal securities law claim.

We agree with the plaintiffs' contention that the notice of claim statute does not apply to the federal securities law claim based upon Section 12(2) of the 1933 Act. This is not a diversity claim requiring application of state substantive law. *Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). As stated in 2 Moore's Federal Practice § 209, at 456, "Where a federal matter is involved state law has no bearing except to the extent that federal law makes reference to and utilizes it. Thus in an action to enforce a federal right where Congress has not provided a statute of limitations, the proper state statute is applied if the action is essentially legal. . . ." The Section 12(2) claim is governed by a federal statute of limitations specified at Section 13 of the 1933 Act. A claim under Section 12(2) requires no reference to state law. The notice of claim statute is inappropriate as a statute of limitations, as its application would frustrate the assertion of a federal right of action. *See United California Bank v. Salik*, 481 F.2d 1012 (9th Cir. 1973); *Douglass v. Glenn E. Hinton Investments, Inc.*, 440 F.2d 912 (9th Cir. 1971). Strict application of the notice of claim statute as a state required condition precedent to suit would also unduly interfere with the federal action. In this regard the notice of claim statute is analogous to state statutes requiring the posting of security for expenses. Such statutes have been found inapplicable to federal causes of action. *McClure v. Borne Chemical Co.*, 292 F.2d 824 (3rd Cir.), *cert. denied* 368 U.S. 939, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); *Fielding v. Allen*, 181 F.2d 163 (2nd Cir.), *cert. denied sub nom. Ogden Corp. v. Fielding*, 340 U.S. 817, 71 S.Ct. 46, 95 L.Ed. 600 (1950); *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (dicta). Accordingly, the notice of claim statute will not operate to bar this action against the City.

Given our rulings on the notice of claim issue, we need not reach the City's contention that the plaintiffs' failure to plead compliance with the notice of claim statute as a condition precedent requires dismissal.

 Pittsburg also seeks dismissal or summary judgment based upon its alleged immunity. The bar of the Eleventh

Amendment does not extend to counties and similar municipal corporations. *Lincoln County v. Luning*, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Moor v. County of Alameda*, 411 U.S. 693, 717–721, 93 S.Ct. 1785, 1799–1801, 36 L.Ed.2d 596 (1973); *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). Even if sovereign immunity did extend to cities, a governmental entity can ,waive immunity by participating in a field subject to federal regulations. *Parden v. Terminal Railway of the Alabama State Dock Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

The City contends that the judicially created doctrine of tort immunity for municipalities requires dismissal of the remaining federal securities law claim. Section 12(2) of the 1933 Act expressly provides for a private cause of action under federal law. This is not an implied cause of action in the nature of a tort for the violation of a statutory duty. Accordingly, we find that the doctrine abrogating a city's liability for torts fails to immunize the city from Section 12(2) liability. Even if the immunity doctrine were applicable, the city's conduct here was arguably of a proprietary nature and dismissal would be inappropriate. See discussion of tort immunity for state claims, *infra.*

■ The City of Pittsburg also contends that the Tenth Amendment to the Constitution protects it from the application of the federal securities laws. The Tenth Amendment provides:

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

The Supreme Court held in *National League of Cities v. Usery*, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976) that the Tenth Amendment acts as a limitation upon the federal government's power under the commerce clause, Art. I, § 8 of the Constitution, insofar as federal regulations "operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions . . . ." *Usery* dealt with the validity of the 1974 amendments to the Fair Labor Standards Act that purported to extend the coverage of the act to employees of cities and states. The five member majority of the Court stressed that the propriety of federal regulation of state conduct is dependent upon whether the state conduct involves functions essential to the state's separate and independent existence. Examples of these integral functions include fire prevention, police protection, sanitation, public health, and parks and recreation. While the listing is not exhaustive the Court stated, "it is functions such as these which governments are created to provide, services such as these which the States have traditionally afforded their citizens." The Court considered the increased costs that would be incurred, whether a state would be forced to relinquish important governmental activities and whether the federal regulations interfered with policy choices of government officials. In his concurring opinion Justice Blackmun stated that he perceived a balancing test should be used in determining whether a particular public service or activity is immune from congressional commerce power. Given Justice Blackmun's presence with the bare majority on the Court's opinion, his suggestion cannot be ignored.

In the instant case we must determine whether the federal government is prohibited from interfering with a local government's power to issue industrial development bonds by imposing private liability for wrongful conduct. We find no Tenth Amendment bar to such liability. The issuance of industrial development bonds does not rise to the level of a traditional governmental function. In *Amersbach v. City of Cleveland*, 598 F.2d 1033 (6th Cir. 1979), the Sixth Circuit analyzed the services and activities the Court characterized as typical of those performed by governments. The common elements found in these services and activities included:

(1) the government service or activity benefits the community as a whole and is available to the public at little or no direct expense;

(2) the service or activity is undertaken for the purpose of public service rather than for pecuniary gain;

(3) government is the principal provider of the service or activity; and

(4) government is particularly suited to provide the service or perform the activity because of a communitywide need for the service or activity. *Id.* at 1037.

The primary benefits of an industrial development bond issue flow to the manufacturer who has effectively borrowed funds at a very low interest rate and to the bond purchasers who will receive tax-exempt interest. Only secondary benefits such as increased employment and increased corporate spending in the locale inure to the community as a whole. Although the city does not directly receive a pecuniary gain by issuing industrial development bonds, the city would indirectly gain from increased employment and spending in the community. Government is not the principal provider of funds for private corporations, and is not particularly suited to provide the service because of a communitywide need.

Furthermore, we can perceive no substantial costs that would be incurred, no important governmental activities that need be foregone, and no significant interference with policy choices of government officials that would result from exposure to private liability for federal securities violations. On the other hand, much benefit would be enjoyed by bond purchasers, citizens of the city who might be potential employees of the lessee company, and the city itself if the issuer of industrial development bonds would conduct itself in accordance with standards by which it could avoid liability for fraudulent conduct in a bond issue.

We find no threat to the state's separate and independent status in federal regulations requiring issuers of industrial development bonds to abide by the same antifraud provisions applicable to corporate issuers. The fact that the federal government has chosen to exempt some governmental issues, including certain industrial development bonds, from the federal securities antifraud provisions does not mean that it lacks the power to impose such restrictions.

## III. ALLEGED VIOLATIONS OF STATE LAW

### A. *Propriety of Applying Kansas Law.*

■ Counts III, IV, and V of the plaintiffs' third amended complaint assert violations of the Kansas Securities Act at K.S.A. 17–1253, –1255, and –1268. A conflicts of law question has been raised as to whether Kansas law properly applies here. Defendants contend that the purchaser's cause of action is controlled by the Blue Sky Laws of the state where the security is purchased and the harm sustained. While we have found no Kansas cases addressing this issue directly, the reported Kansas securities cases disclose no instance in which the state statute has ever been applied where the purchases occurred outside the state. *State v. Hodge*, 204 Kan. 98, 460 P.2d 596 (1969); *Allen v. Schauf*, 202 Kan. 348, 449 P.2d 1010 (1969) (plaintiffs were purchasers in Kansas, purchasers in Arizona were not parties to the action although they testified as witnesses); *Deets v. Hamilton Management Corp.*, 2 Kan.App.2d 452, 581 P.2d 826 (1978). Relevant to this issue is the following statement by Professor Louis Loss:

> The problem of choice of law with respect to the anti-fraud aspects of the blue sky laws need not be labored, because presumably the conflict-of-laws rules are not too different there from the rules for common-law deceit or rescission. So far as common-law deceit is concerned, the general view of the American courts in tort cases is that the "place of wrong" is "in the state where the last event necessary to make an actor liable for an alleged tort takes place." Thus, in a common-law deceit action the place of wrong is where the loss is sustained, not where the fraudulent representations are made. Louis Loss, *The Conflict of Laws and the Blue Sky Laws*, 71 Harvard L.Rev. 209, 210 (1957).

This is also the approach taken in the *Restatement (First) of the Law of Conflicts* § 377, Rule 4 and Illustrations 5 and 6 (1934). Kansas continues to follow the traditional *lex loci delicti* rule. *McDaniel v. Sinn*, 194 Kan. 625, 400 P.2d 1018 (1965). In

*McDaniel* the Kansas Supreme Court did not adopt the "significant contacts" choice of law rule that plaintiffs advocate here. We find nothing in the Kansas securities statutes that would alter the traditional rule. Accordingly, we conclude that the state law to be applied is that of the state where harm was sustained by each plaintiff.

Plaintiffs have not alleged whether any of the class members sustained harm in Kansas. The non-communication order that has been in effect in this action may have prevented plaintiffs' counsel from ascertaining where each member purchased bonds. We will not sustain defendants' motion to dismiss and for summary judgment on the Kansas Securities Law claims at this time. After plaintiffs' counsel has had an opportunity to communicate with the bond purchasers, and upon a proper motion and presentation of the pertinent information, we will determine whether to dismiss, certify a subclass, or decertify the class as to these counts.

An analysis similar to that applied to the Kansas Securities Act claims also applies to Count VI, a claim of fraud and deceit based upon Kansas law. Such a claim is appropriate only if plaintiffs were harmed in Kansas. We will await further motions and information from the parties before taking any action on this claim as well.

Count VII asserts a claim based upon the law of negligence. As with the Kansas Securities Act and fraud claims, we would like to resolve prior to trial what law applies to the claim and whether the plaintiffs will be permitted to proceed on the claim as a class.

■ Defendants also seek dismissal of Counts VIII and X that ask for punitive damages for the alleged violations of the Kansas Securities Act and of Kansas law on fraud and deceit and of the law of negligence. We agree with defendants that no punitive damages are available under the Kansas Securities Act. We believe it would be best to address the punitive damages issue on the fraud and negligence claims after we have resolved what law applies to these claims.

## B. *Pittsburg's General Defenses to the State Law Claims.*

The City of Pittsburg asserts the previously mentioned municipal defenses to the state law claims. We will assume that Kansas law applies for the purpose of addressing these defenses. As a governmental entity, the City asserts defenses that cannot be raised by other defendants. The defenses include the failure of the plaintiffs to comply with the notice of claim statute, the failure to plead compliance with the notice of claim statute, and governmental immunity.

■ The City has failed to show that the notice of claim statute bars the state claims. This statute created a condition precedent to bringing certain actions against a city. *E. g. James v. City of Wichita, Kansas*, 202 Kan. 222, 447 P.2d 817 (1968). Notice must be filed with the city within six months of any personal injury or damage to property. K.S.A. 12–105. The provision has been repealed. 1979 Kan. Sess.Laws, Ch. 186, § 33. The claim based upon breach of contract is clearly outside the scope of this section. *Stauffer v. City of Topeka*, 200 Kan. 287, 289, 436 P.2d 980 (1968); *Lux v. City of Topeka*, 204 Kan. 179, 460 P.2d 541 (1969). As to the other state claims, a question exists as to whether a notice of claim was in fact properly filed by the plaintiffs. Plaintiffs filed a notice of claim with the City on January 14, 1977. Plaintiffs contend that while they knew they had been damaged when the interest payment on the bonds was missed, they did not know that they had a viable cause of action against the City until the depositions of city officials were taken in late July of 1976. The claim was then filed within six months of the depositions. The Kansas Supreme Court has stated that the purpose of the notice of claims statute "is to sufficiently advise the municipality of the time and place of the accident or injury and inform it of the circumstances and extent of possible damages incurred." *Bradford v. Mahan*, 219 Kan. 450, 457, 548 P.2d 1223, 1230 (1976). In this case the City knew of the default on the part of Homes & Structures,

and the subsequent impossibility of meeting the interest payments, before such knowledge was available to bond holders. The notice of claim statute was apparently developed to cover damages and injuries from street defects, maintaining a nuisance trespass and similar torts. In such cases the City is unlikely to know of any harm that has resulted or of the harmful condition itself. We are not prone to blindly apply the narrow notice requirement to a case such as the one now before us in which the City knew of the harm even before the persons who would suffer that harm. At the very least, a question of material fact remains in dispute as to when the plaintiffs reasonably should have known they had a viable claim against the City.

 The City also maintains that plaintiffs' state claims should be dismissed because of the doctrine of immunity. With respect to torts, the Kansas law of immunity has been unsettled over the past decade. This period of uncertainty ended with the legislature's enactment of the Kansas Tort Claims Act, 1979 Kan.Sess.Laws, Ch. 186, §§ 1–15. The act applies to claims against a city arising from acts or omissions occurring on and after July 1, 1979. Prior to the legislative enactment, the Kansas Supreme Court had modified the judicially created doctrine of immunity as it applies to municipalities in *Gorrell v. City of Parsons*, 223 Kan. 645, 576 P.2d 616 (1978). In *Gorrell* the court abolished the proprietary-governmental distinction and recognized immunity for a city's acts and omissions "constituting the exercise of a legislative or judicial function, or constituting the exercise of an administrative function involving the making of a basic policy decision." The court recognized that "it has long been the rule in this state that a municipality is not liable for the negligent acts of its officers or employees in the performance of a governmental function, unless such liability is expressly imposed by law." An exception to this immunity is noted for negligent and wrongful acts occurring when a city is acting in a proprietary capacity. *E. g. Wendler v. City of Great Bend*, 181 Kan. 753, 316 P.2d 265 (1957). Because the Kansas court specifically recognized the above-stated rule as the law prior to *Gorrell*, and because the events leading to the litigation before us occurred prior to *Gorrell*, we believe it is necessary to apply the pre-*Gorrell* rule.

The Kansas Supreme Court has also commented upon what constitutes a proprietary function as follows:

We are mindful of what was said in 60 A.L.R.2d at page 1204:

The general tests provided by the courts for determining whether a particular municipal [governmental] function may be regarded as governmental or proprietary have not proved adequate for the resolution of particular questions; and as a result the courts have frequently treated such questions on their individual merits, often reaching at least superficially conflicting results.

It should be stated as elementary that each case must be governed by its own particular facts. However, we may reach a rather broad understanding to which a particular set of facts may be applied. It may be said that when a state by itself, or through its corporate creations, embarks on an enterprise which is commercial in character or which is usually carried on by private individuals or private companies, it is engaged in a proprietary enterprise (*Stadler v. Curtis Gas, Inc.*, 182 Neb. 6, 151 N.W.2d 915). *Carroll v. Kittle*, 203 Kan. 841, 457 P.2d 21 (1969).

The court then cites with approval the following quotation in *Stolp v. City of Arkansas City*, 180 Kan. 197, 202, 303 P.2d 123, 127 (1956):

It is also included in the general rule covering the dual capacity of cities and towns that when there is an activity or function in a private or proprietary capacity for the special or immediate profit, benefit, or advantage of the city or town, or the people who compose it, rather than for the public at large, then the city or town is in competition with private enterprise and is accountable for the torts of its employees the same as any other private corporation or individual. . . .

Another criterion for the determination is whether the City has acted in performance of a duty imposed by the state or in an exercise of permissive authority given by the sovereign. *Wendler, supra.*

The determination of whether the City's acts and omissions were governmental or proprietary will ultimately be made at trial. However, the plaintiffs have presented strong arguments that the (1) acquisition of real estate by the City, (2) construction of a facility upon such property by the City, (3) leasing of such facility to a private, for-profit business corporation, and (4) issuance of bonds to finance such an acquisition and construction constitute proprietary conduct. In effect, the City "sold" its credit to Homes & Structures in the form of tax exempt bonds in return for benefits to the local community in the form of increased employment and increased corporate expenditures. The acts of the City can also be characterized as carrying out the permissive—not mandatory—authority given the City in the Kansas industrial development bond statutes. Dismissal on the basis of immunity is inappropriate.

C. *Pittsburg's Motion for Summary Judgment on the Breach of Contract Claim.*

 The City moves for summary judgment on the plaintiffs' Count IX alleging breach of contract. The contract purportedly breached is the bond ordinance itself. Section 14 states: "The provisions of this Ordinance shall constitute a contract between the City of Pittsburg, Kansas, and the holders of the Revenue Bonds herein authorized, and the holder of any one or more of said Bonds may sue, in any action in mandamus injunction, or other proceedings, either at law or in equity, to enforce or compel performance of all duties and obligations required by this Ordinance to be done or performed by this City."

The breaches alleged by the plaintiffs include:

(1) Reckless failure to investigate the financial condition of Bost, Homes & Structures and A & A, Inc., in violation of the clause stating that "all acts, conditions and things required to be done and to exist precedent to and in the issuance of this Bond, have been properly done and performed and do exist in due and regular form and manner . . . ;"

(2) payment for insurance on the plant out of funds taken from the Principal and Interest account;

(3) the closing of the Principal and Interest account without bondholder approval and while the bonds were still out;

(4) the execution of surety bond No. 863 as a modification of the bond, ordinance without bondholder approval;

(5) the failure to enforce collection of rental payments in accordance with the lease;

(6) the modification of the lease to reflect a November 30, 1974 initial rent due date; and

(7) making or facilitating payment of requisitions that were not supported with adequate detail.

Without exception, we find that the City has failed in showing that no material facts remain in dispute in this motion for Rule 56 relief on the breach of contract claims. The suggestions of the City in support of the motion lacked specific references to supporting evidence and relied in large part on unsupported conclusions. The plaintiffs' response presented specific evidence to show that material disputes remain on each and every allegation of a contractual breach. We shall not belabor the point by addressing each allegation separately. Summary judgment on the alleged breaches is inappropriate.

We also find no merit in the City's contention that its liability for the alleged contractual breaches is limited to the value of the remaining facilities. The contract and the authorizing statutes at K.S.A. 12–1740 to –1749 are better read to provide such a limitation upon the contract in the absence of breach. If proved, damages for breach of contract will be awarded in accordance with Kansas law; this includes damages which "may fairly be considered as arising, in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contem-

plation of both parties as the probable result of the breach." *Kansas State Bank v. Overseas Motosport, Inc.*, 222 Kan. 26, 27, 563 P.2d 414, 415 (1977).

## IV. SUMMARY

We previously deferred ruling on plaintiffs' motion to rescind our order prohibiting communication with potential or actual class members. The class has been certified and the non-communication order entered in this case on July 16, 1975 no longer serves a useful purpose. The order is rescinded.

The parties are urged to arrange for a final pretrial conference with the magistrate. Every effort should be made by the parties to narrow the issues in this litigation and assist the court in developing a single pretrial order that focuses upon the claims that will be fully advocated at trial. We suggest that when plaintiffs' counsel collects claim forms and copies of supporting documents, the class members should verify their claims.

IT IS THEREFORE ORDERED that defendant's motion to dismiss the Rule 10b–5, Section 10(b) claim against the City of Pittsburg be and hereby is sustained; that defendants' motion to dismiss the Section 17(a) claim be and hereby is sustained; that the plaintiffs' Section 12(2) claim against the City is dismissed without prejudice and the plaintiffs may submit an amended complaint pleading compliance with the Section 13 statute of limitations within 20 days; that in all other respects the defendants' motions to dismiss and for summary judgment be and hereby are overruled in accordance with the above memorandum; and that plaintiffs' motion to rescind the non-communication order be and hereby is sustained.